### IN THE

# SUPREME COURT OF JUDICATURE

#### OF THE

### STATE OF NEW-YORK,

**In May Term, 1840,—in the sixty-fourth year of the Independence of the United States.**

---

THE PEOPLE, *ex relatione* Charles Bishop, *vs.* THE KINGSTON AND MIDDLETOWN TURNPIKE ROAD COMPANY.

Non-compliance with the requirements of an act of incorporation of a turnpike company, as to the *construction of the road*, is *per se* a *misuser*, forfeiting the privileges and franchises conferred.

It is not necessary, to work a forfeiture, that the neglect or refusal to perform the duties enjoined, should proceed from a *bad* or *corrupt motive;* it is enough that the duties be *neglected*, or *designedly omitted.*

In a proceeding by *information* in the nature of a *quo warranto*, facts necessary to be alleged to show a neglect of duty, must be set out with all the exactness of pleading required in an action for a penalty.

The duties enjoined by an act of incorporation, are *conditions* attached to the grant of the franchises conferred. A *substantial performance*, however, is all that is required, whether they be conditions *precedent* or *subsequent.*

Conditions *implied* are more favorably construed than conditions *expressed.*

The favorable *report of commissioners* appointed under the general turnpike act to view a road, and the subsequent *license* of the governor to erect turnpikes for the collection of tolls, are not a bar to an *information in the nature of a quo warranto,* charging a non-compliance with the terms of the act in the original construction of the road.

Nor is an act of the legislature *extending the time* for the completion of the road, a bar to an information in respect to a portion of the road completed *before the [ *194 ] passage of such act, and on which gates had been erected, and tolls collected.

Nor will such act be deemed a *waiver* of breaches of conditions, and a *confirmation* of the charter, unless the intent of the legislature in that respect be expressly declared, or is necessarily to be implied from the provisions of the act.

Where a company is authorized to erect gates at such places as they see fit, and to demand tolls at certain rates, *for every ten miles,* and *in the same proportion for a shorter distance,* they

The People v. The Kingston and Middletown Turnpike Road Company.

may demand tolls according to *the distances between the gates* or turnpikes on the road; and are not limited *to the distance travelled* by the persons from whom tolls are demanded.*

INFORMATION in the nature of a *quo warranto*.   In January term, 1839, the attorney general filed an information in the nature of a *quo warranto*, against the Kingston and Middletown Turnpike Road Company, charging them with *usurping* the liberties, privileges and franchises of being a body politic and corporate, by the name of the Kingston and Middletown Turnpike Road Company, and by that name to construct and maintain a turnpike road within certain *bounds, (specifying the same,)   [ *195 ] and to erect and maintain gates and turnpikes upon such road, and to levy and collect tolls from all persons using the same.  All which liberties and privileges he charged to have been usurped.

The defendants pleaded, that by an act of the legislature, passed 17th February, 1831, they were erected a body politic and corporate, and were authorized to construct a turnpike road from a certain point near the village of *Kingston*, to the line of the *county of Delaware;* to erect one or more toll gates on the road at such places as they might think expedient, and to demand and receive toll at certain rates, particularly set forth, for every ten miles, and in the same proportion for a shorter distance or less number of miles.   They further alleged, that by the same act, it was enacted that they should not be required to have the road laid out of a greater width than 50 feet, nor to make the bed or arch thereof more than 20 feet in width ; and where the steepness of the side hills, rocks or obstacles should render it impracticable or unnecessary, in the opinion of the commissioners to be appointed by the governor, to complete the road of that width, that it should be lawful for them to make and complete it of a less width, and without a ditch on

*Propositions advanced by* COWEN, J. *in his dissenting opinion.*

Deficiences in the construction of a turnpike road, existing *previous* to the report of the commissioners appointed to view the same, cannot be urged as grounds of forfeiture; the state is *estopped* by the *report* and the governor's *license* to erect gates.

An act of the legislature, extending the time for the completion of a turn-pike road, is a *waiver of previous forfeitures*, and excuses the turnpike company as to defects in the portion of the road constructed previous to the passage of such act.   Whether the act would be deemed to have had that effect, had the *taking toll* been charged in the information, *in connection with the defects* in the road, *quere.*

After the road, on any part thereof, is accepted by the state as completed, the company are not required to keep it in the *exact condition* in which it was constructed ; if it be continued in a reasonable state of repair, and defects as they happen are supplied in a reasonable time, the duty of the company is discharged.

Where an information is filed against a turnpike company, for omission of duty happening subsequent to the granting of a license to erect gates and demand tolls, and the company sets forth its charter by way of plea, the replication, like an indictment for a nuisance, must allege either that the road has not been kept in repair, *according to the duty* of the corporation, or that it has been suffered to be out of repair, or has become inconvenient in some particular, *contrary to that duty*, stating wherein; and the charge must be, that the omission was *wilful, negligent*, or *contrary to duty.*

the lower side ; but that in no place should the bed of the road be of a width less than 18 feet.

The defendants further alleged, that their act. of incorporation was *amended* in various particulars by an act of the legislature, passed on the 5th day of May, 1834, by which, among other things, the ·time for completing the turnpike road was extended for the term of three years ; that on the 1st July, 1834, having constructed more than *ten* miles of the road, to wit, the distance of *eleven miles* from its commencement, they gave notice thereof to the then governor of the state, who appointed three discreet freeholders to view the road and report to him whether the same was completed according to the requisitions of the revised statutes and the act of incorporation of the defendants ; that the freeholders thus appointed viewed the road, and made a favorable report to the governor, who on the 18th July, 1834, by *license*, under his hand, &c. allowed and permitted *the defend-     [ *196 ] ants to erect so many gates and turnpikes on the road as should be sufficient for the collection of the tolls authorized by the act of incorporation ; whereupon the defendants on the next day erected one gate, appointed a toll gatherer, and have collected and still do collect, &c.

The defendants further pleaded, that having constructed *another portion* of the road, from the end of the *eleven miles* to a certain bridge, making the whole distance 20 miles, they on the 1st September, 1834, gave notice there·of to the governor ; that on the 13th May, 1836, the act of incorporation of the company was further amended by an act of the legislature *extending the time* for completing the road to 1st November, 1839 ; and that defendants proceeded and constructed *another portion* of the road, extending from the bridge above mentioned to a certain other point, making the whole distance from the commencement of the road, 25 miles ; leaving from the point last referred to, to the termination of the road authorized to be constructed, *eleven miles* and upwards. That they made report of the completion of such additional portion of the road to the governor, who again appointed inspectors to view the road, who having made a favorable report, the governor, on the 7th October, 1836, granted a *further license* to the defendants to erect as many gates and turnpikes as should be sufficient, &c. By virtue whereof the defendants on the 8th October, 1836, erected two other gates or turnpikes on the said 25 miles of road, and have since collected from all persons using the road the tolls authorized by the act of incorporation, for every ten miles of said twenty-five miles, and in the same proportion for a shorter distance—or less number of miles—concluding in the usual form.

To this plea the attorney-general put in *thirty replications.* To that portion of the plea which avers the construction of the *first eleven miles* of the road, *six replications* were interposed : 1. That the portion of the road so constructed was not originally laid out nor is it now of the width of *fifty feet* ; nor was the bed or arch of the road, nor is it now, *twenty feet* wide, in all

[ *197 ] places except where the steepness of the side hills, &c. render it impracticable to *complete it of that width, nor was it in such places, nor is it now, *eighteen feet* wide ; 2. That the said portion of the road was not, nor is now, *bedded with stone, gravel, sound wood, or other hard substance,* well compacted, and of sufficient depth to secure a good and solid foundation in all places of the width of twenty feet, where practicable, and where not practicable, of the width of eighteen feet ; 3. That the said portion of the road was not, nor is now, *faced with gravel or broken stone,* of a depth not less than nine inches, in such manner as to secure a firm and even surface, rising in the middle by a gradual arch ; 4. That the *ditches* on each *side* of the said portion of the road were not when practicable, nor are they now, so made as to *render easy the passing of sleighs therein,* nor were they, nor are they now so formed as to *permit carriages conveniently to pass on and off* that part of the road where it was or is intersected by other roads ; 5. That the lower side of the said portion of the road, where the same was not of full width, was not, nor is it now, furnished with *a strong fender or railing* of the height of at least four feet above the surface of the road, (without averring that circumstances existed in any part of the road rendering a *fender* necessary) ; and 6. That on the said portion of the road so constructed, a *mile stone* or *post* was not, and is not erected and maintained on each mile of the road ; nor was there, or is there now erected a *guide post,* at the intersection of every public road. *Six similar replications* were interposed by the attorney-general to that part of the plea which relates to the *second portion* of the road constructed by the defendants, and *six like replications* to that part of the plea which relates to the *third portion* of the road constructed by the defendants. Then follow six like replications to the *whole extent of twenty-five miles of the road* alleged by the defendants to have been constructed. Next the attorney-general, in his *twenty-fifth* replication, alleges that *previous* to the time of the *granting of the licence* by the governor, for the erection of gates and demanding of tolls on the portion of the road *firstly constructed,* the defendants having erected one gate or turn-

[ *198 ] pike thereon, did, on 10th July, 1834, and for a long *time before and after, and until they were licensed as aforesaid, demand and receive from all persons travelling on the road, (naming two individuals,) such tolls as they were authorized to demand *after* they should be licensed. In the *twenty-sixth replication* the attorney-general alleges, that *after* the time when it is alleged that the *license* by the governor to erect gates and to demand tolls on the portion of the road *firstly* constructed was granted, to wit, on the 10th August, 1838, the defendants *demanded from several persons* (naming them) *more than they were authorized by law to demand,* and more than after the rate of six cents for every score of sheep, &c. (specifying the rates of toll enumerated in the act of incorporation.) In the *twenty-seventh replication* the attorney general alleges, that *after* the license, to wit, on 10th

The People v. The Kingston and Middletown Turnpike Road Company.

August, 1838, the defendants *demanded* from persons travelling the road with *four wheeled waggons or carriages drawn by two horses*, to wit, from, &c. (naming several individuals) more than at and after the rate of *twelve and a half cents for every ten miles*, or in the same proportion for a shorter distance or less number of miles, to wit, *six cents for three miles and three quarters*, whereas they were entitled to demand no more than *four cents and eleven-sixteenths of a cent*. In the *twenty-eighth replication* the attorney general alleges, that *after* the license, to wit, on 10th August, 1838, the defendants demanded from persons travelling the road *with waggons drawn by one horse*, to wit, from, &c. (naming several individuals) more than at and after the rate of *six cents for every ten miles*, or in the same proportion for a greater or less number of miles, to wit, *six cents for five miles*, whereas they were entitled to demand *no more than three cents*. In the *twenty-ninth replication* the defendants are charged with demanding, after the license, to wit, on the 31st December, 1838, from persons travelling on the road *with sleighs drawn by two horses,* &c. more than at and after the rate of *six cents for every ten miles*, to wit, *six cents for five miles*, whereas they were entitle to demand *no more than three cents*. In the *thirtieth replication* the defendants are charged with demanding, after the *license*, to wit, on 31st December, 1838, from persons *travelling the road with sleighs* [ *199 ] *drawn by one horse*, more than at and after the rate of three cents for every ten miles, *to wit, six cents for five miles*, whereas they were entitled to demand no more than *one and a half cents*. Each replication concludes with a prayer for judgment of *ouster* and *dissolution* of the corporation. The defendants demurred : to the *first twenty-four replications* assigning the following as special causes of demurrer : 1. That the time for completing the road is not yet expired ; 2. That the decision of the three freeholders appointed to view the road, their report to the governor, and his license, are conclusive as well in respect to the manner of constructing the road, as in respect to the right of taking tolls ; 3. That the several amendatory acts set forth in the plea are *waivers* of any forfeiture previously incurred ; 4. That the matters alleged by way of replication are not causes for *ousting* or for dissolving the corporation of the defendants ; and 5. Individuals aggrieved have their remedy by action. The defendants also demurred to the residue of the replications, and in addition, to the *third, fourth* and *fifth* special causes above mentioned, specially assigned the two following, viz : 1. That the replications severally conclude with a *verification*, whereas they should have concluded to the country ; and 2. That the matters in the replications alleged are not, by the laws of the state *made* or *declared* to be *forfeitures* or causes of ouster or of dissolution of the corporation of the defendants. The attorney general joined in demurrer.

*H. M. Romeyn & M. T. Reynolds*, for the defendants, insisted, that as the first twenty-four replications set forth nothing beyond deficiencies in

the original construction of the road and variations from the terms prescribed, as far as it has been finished, they contain no matter authorizing judgment of ouster and dissolution. These replications are manifestly based upon the first and second subdivisions of § 39 of the statute relative to informations, 2 *R. S.* 583, which authorize an information to be filed only in cases of *misuser*, and consequently cannot be sustained, as they do not set forth a [ *200 ]   single act of *misuser*. The *manner in which the first and second subdivisions are printed in the revised statutes, would seem to indicate an intention that they should not be read together ; but it is not so, unless our statutes are to receive different constructions, according to the mode of *punctuation* adopted in their several revisions. The subdivisions form part of a continuous section of an act passed in 1825, enumerating cases in which it should be the duty of the attorney general to file informations against corporations, and placing an offence by a corporation against the provisions of its own act of incorporation, and an offence against the provisions of *any* law, upon the self same footing, viz. that if by such offence such company shall have forfeited its charter by *misuser*, it shall be the duty of the attorney-general to file an information. *See Statutes of* 1825, *p.* 450, § 7. The question then arises, what is a *misuser* which will forfeit a charter ? It is answered that it is a perversion of the powers conferred upon the corporation to objects not contemplated by the legislature at the time of its creation, for selfish, corrupt and unlawful purposes, or when the conduct of the company is of such a character as to defeat the objects of the incorporation. It is not a mere omission, nor can it be that every non-compliance with the mode prescribed for constructing the road, although in the most minute and unimportant particulars can be considered an offence against the provisions of the act of incorporation subjecting the company to forfeiture of its charter ; especially where the company is formed for the construction of a turnpike, a rail road, a canal or a bridge, and where large sums of money have been invested in good faith, in the construction of the canal, road or bridge. Harsh as would be a proceeding for a forfeiture in reference to a company incorporated for *banking purposes*, for a deviation in some unimportant particular from the provisions of its act of incorporation, a thousand fold harsher would it be in respect to a canal, turnpike, rail road or bridge company. In the forfeiture of the charter of a banking company, nothing is taken away but the *franchise*, the funds of the company remaining ; but in the case of either of the other companies, not only is the *franchise* taken *away, but    [ *201 ] the *property* of the company is lost. It is taken by the state ; and the state takes what never belonged to it. Whilst therefore there are other remedies, the proceeding by *quo warranto* ought not to be adopted in respect to the latter companies. If the road, canal or bridge has not been constructed according to the requirements of the statute, and the company demand tolls without having obtained the license of the governor to erect gates, let

the company be indicted for maintaining nuisances; if licenses have been obtained and the road is out of repair, let the gates be thrown open by turnpike inspectors; and if special injuries be sustained by individuals, let them bring their private actions for the recovery of damages. The rule in England is not to give leave to file an information, unless there be *fraud* or *serious mischief*. The court say they will not be made the instruments of malignant feeling. 6 *Adolph. & Ellis*, 810. Besides, the legislature having declared in what cases a turnpike company shall cease to be a body corporate, its charter cannot be taken away for any causes other than those expressed in the act, which are, 1. When the company has not commenced the construction of the road within two years from their incorporation, and 2. When the road is not completed within five years. 1 *R. S.* 580, § 15. This, upon the principle of *expressio unius*, &c. it is submitted should be deemed conclusive.

They also insisted that if the defects and variations in the original construction of the road were causes of forfeiture, that the state were *estopped* by the certificates of the commissioners and the *licenses* of the governor, from urging those deficiences in this proceeding; and, at all events, that the extension of the time for the completion of the road was a waiver of all causes of forfeiture before existing, and a *confirmation* of the franchises granted to the defendants.

As to the six last replications relating to the taking of toll *before license* to erect gates, and demanding *excessive toll* after license, the counsel for the defendants insisted: as to the first, that if cause of forfeiture, it was *waived* by the act extending the time for completion of road; and as to the last, that it was not charged in the information that the tolls were demanded *knowingly and fraudulently, and with a view unlawfully [ *202 ] to increase the gains of the company; that they might have demanded under a *mistake* of the rights of the company; and that such was the intendment of law. That the object of the attorney-general in respect to the four last replications, seems to have been to raise the question whether the tolls could be asked in reference to the distance between the gates, or whether the company should be restricted to the distance actually travelled on the road by the person from whom the tolls were demanded; in respect to which the case in 1 *Caines*, 182, was conclusive that the company had not erred. At all events, there should be judgment of ouster, only as to that part of the road upon which excessive tolls had been demanded.

*Willis Hall*, (attorney-general,) & *S. Stevens*, for the people, insisted that a non-compliance with the requirements of the act of incorporation as to the mode of constructing the road, was a cause of forfeiture. The revised statutes making it the duty of the attorney-general to file an information against every corporation *offending against the provisions of the act incorporating such company*, is a legislative declaration that if the information be found to be true, judgment of ouster and dissolution shall be pronounced.

New-York, May, 1840.—People v. Kingston and Middletown Turnpike Road Co.

The legislature have furnished remedies other than forfeiture against corporations for misfeasance and non-feasance ; but such remedies are cumulative only, and do not destroy the remedy by *quo warranto*, or *information* in the nature of a *quo warranto*. Other remedies also exist at common law, such as indictment against the corporation, and private action at the suit of individuals specially aggrieved ; but neither these or the statutory remedies are or can be a bar to an information ; if they were, the remedy by information would be wholly destroyed.

The *certificates* of the commissioners, and the *licenses* of the governor are not a bar to the prosecution, in a direct proceeding to test the rights of the company to enjoy the franchises granted to them. The report of the commissioners is a precautionary measure to guard the public against [ *203 ] *imposition by the demand of toll before the road is properly finished ; but it was not intended as a final adjudication concluding the state. Suppose it could be shown that the commissioners had fraudulently been imposed upon by the company, would the state be concluded ? But it is not to be endured that on an inquiry instituted by the state, whether there be such a road as is required by the provisions of the statute incorporating a turnpike company, that the certificate of the commissioners shall be an answer. The commissioners' report and the governor's license are but cumulative remedies.

Nor can the defendants avail themselves of the acts of the legislature *extending the time* for the completion of the road as a *waiver* of the forfeitures incurred. No principle of law is better settled than that there can be no waiver of breaches of conditions attached to grants, without *knowledge* on the part of the grantor, of the existence of such breaches. That is not shown here. Nor is the act extending the time a waiver of the forfeiture incurred by the taking of tolls *before* the grant of licence by the governor, for the reason above suggested. As to the taking of *excessive toll*, subsequent to the licence, it was not necessary to aver in the replications that such toll was demanded *fraudulently*. The company admit that the tolls were demanded as charged ; if any excuse existed, such as *mistake*, or the like, they should have rejoined and not demurred. The decisions in 1 *Caines*, 122 has, no application here ; in the case there reported, the company could not erect gates at distances shorter than ten miles, whilst the defendants here might erect their gates at such places as they saw fit.

*By the Court*, NELSON, C. J. It is contended that the matters set forth in the several replications of the attorney-general, are not causes of forfeiture of the corporate privileges of the defendants, and that, therefore, the replications are no answers to the plea. The first 24, contain matters which, if true, shew a failure to perform six separate and distinct conditions annexed to the grant, specifying particularly the nature of each. The remaining replications will be noticed hereafter. The question for the present

will be, whether this breach, or neglect to comply with any or　[ *204 ] all the requirements of the charter, shall work a forfeiture either by statute, or at common law.

The statute, 2 *R. S.* 483 § 39, provides for the filing of an information against a corporate body, whenever it shall, 1. Offend against any of the provisions of the act or acts, creating, altering or renewing such corporation ; or 2. Violate the provisions of any law, by which such corporation shall have forfeited its charter by *misuser;* or 3. Whenever it shall have forfeited its privileges and franchises by *nonuser ;* or 4. Whenever it shall have done, or omitted any acts which amount to a surrender of its corporate rights, privileges and franchises, or 5. Whenever it shall exercise any franchise or privilege, not conferred upon it by law.

It has been strongly urged for the defendants, that the two first clauses, though apparently declaratory of two separate grounds of forfeiture, should be read together ; and that the *offences against the provisions of the act*, creating the corporation, as specified in the *first*, the same, as the *violation of any of the provisions of law*, as specified in the *second*, must be such as will work a forfeiture by *misuser* in terms, in order to justify the filing of the information. This is supposed by the defendants' counsel to have been the substance of the act of 1825, *Sess. Laws, p.* 450, § 7, from which these provisions were taken. But on a reference to that act, it will be found otherwise : the two separate grounds are as distinctly marked there as here. The seventh section provides, that in case the president, directors and company of any corporation, shall at any time *offend against any of the provisions of the act or acts of incorporation*, or against *the provisions of any law by which such company shall have forfeited* its charter by *misuser*, &c., it shall be the duty of the attorney-general, to prosecute, &c. and obtain judgment that such corporation be dissolved. Both statutes obviously intended, that corporations should fulfil the conditions, and perform the duties enjoined by the fundamental law of their creation, as the terms upon which to enjoy their privileges. The principle is not new ; it has been always so held at common law as fundamental. Lord Holt said, in *London*

*City* v. *Vanacre*, 1 *Ld. Raym.* 498, all franchises which are　[ *205 ] granted, are upon condition, that they shall be duly executed, according to the charter that settles their constitution : and *that* being a condition annexed to the grant, the citizens cannot make an alteration : but if they neglect to perform the terms of the patent, it may be repealed by *scire facias.*" The principle is so thoroughly, and firmly fixed in the law of corporate bodies, that I need do no more than refer to some of the authorities. A non-performance, therefore, of the conditions of the act of incorporation, is deemed *per se* a *misuser*, that will forfeit the grant even at common law ; and hence, if the reading of the statute claimed, be conceded, it would not change the legal effect. 12 *Mod.* 271. *Cruise, tit. Franchise,* § 79. *J. in Heane* v. *Rogers, 9 Barn. & Cress.* 577. Being pleaded, however, *Willcocks on Corp. p.* 334. *Angel & Ames on Corp.* 510, *and cases there cited.*

But granting this to be the general principle, the question still comes up for consideration, what departure from the provisions of the charter will work a forfeiture ?   Shall every omission, or non-performance of a condition of the grant have this effect ?   Though the proceeding by information be against the corporate body, it is the acts or omissions of the individual corporators, that are the subject of the judgment of the court.   The powers and privileges are conferred, and the conditions enjoined upon them ; they obtain the grant, and engage to perform the conditions : and when charged with a breach, I do not perceive any reason against holding them accountable upon principles applicable to an individual to whom valuable grants have been made upon conditions precedent or subsequent.   As to him, performance is indispensable to the vesting or continued enjoyment.   If a feoffment be made of lands upon condition of paying rent, building a house, or planting an orchard, and a failure to perform, the feoffer may enter.   So if an office be granted, a condition is implied that the party shall faithfully execute it, and for neglect the grantor may discharge him.   1 *Bacon*, 629.   15 *Wendell*, 291.   1 *id*. 388.   3 *id*. 498.   13 *id*. 530.

[ *206 ]     Placing corporate grants upon this footing, there can be no great difficulty in ascertaining the principles that should *govern conditions annexed to them.   The analogous cases of individual conditional grants will give the rule.   In these a reasonable and substantial performance according to the intent of the grantor is required.   *Shep. Touch.* 133. 15 *Wendell*, 291.   In cases of conditions *subsequent*, if impossible to be performed, or rendered impossible by the act of God, the grantee is excused and the estate is absolute.   2 *Bacon*, 676, *tit. Condition.   Shep. Touch.* 133. 157.   So if waste be committed by a stranger, it shall not be a breach of the condition of the lease.   2 *Bacon*, 652.   The whole law on the subject will be found reasonable ; and nothing is required but what is within the means and ability of the party to comply with.   It is emphatically so with respect to corporators : for we all know the nature of the conditions in their charters depend very much upon themselves : they usually settle the terms of the grant, and therein consult their own as well as the public interests. The acceptance also, is voluntary, and must be unconditional.   *Willcocks on Corp.* 31, *and cases there cited.   This view of the case of conditions *subsequent* in acts of incorporation, is confirmed by the settled doctrine in respect to those which are *precedent*.   There, as in the case of individual grants, the condition must be first performed before the franchise vests.   18 *Johns. R.* 137.   9 *Cowen*, 194.   9 *Wendell*, 378, 9.   15 *id*. 127.   *Angel & Ames*, 379.   Even where the corporation undertakes to enforce a contested claim or title in a court of justice, performance of a condition precedent, if any exists, must be either admitted or proved : because being essential to its existence, the proof must be given before a suit can be maintained in the corporate name.

Now I am not aware of any ground that can warrant us in distinguishing

New-York, May, 1840.—People v. Kingston and Middletown Turnpike Road Co.

between the materiality or the legal effect of conditions *precedent* and *subsequent;* or that would exact the performance of the one as a condition of corporate being, and not of the other; the same authority prescribed both, and we are to presume for good and wise ends. Neither has the statute authorizing the filing of informations against corporations made any such distinction, as has already been seen. 2 *R. S.* 483, § 39. We could not, therefore, make one, were we so disposed.

*One strong ground for regarding the conditions in these grants  [ *207 ] in the same light as in cases of private individuals is, that they are mainly obtained with a view to private interests. I admit the public interests are often thereby promoted; and that this is the chief inducement to the grant on the part of the legislature. But most of them are sought for, from considerations of private gain, and which more or less enter into the grant of every private company. In this respect, they differ from public corporations, which are but the investment of a body of citizens with municipal authority for the better government of a place. The corporators have no private interest in the matter. The former are but individuals stipulating for and accepting the grant upon certain terms for their own benefit. The acceptance implies an undertaking to perform them; and to neglect or refuse, is a fraud upon the legislature.

In further illustration of the sort of neglect of duties, which are imposed by the grant of a franchise, or, in other words, the *misuser* that will work a forfeiture, we may refer to a class of cases arising out of the forfeiture of offices. These cases are not all strictly analogous, because the duties enjoined are not so definite and accurately prescribed as in cases of corporations; but they will serve as illustrations. It is laid down as a general principle that if an officer acts contrary to the nature and duty of his office, or refuses to act at all, he forfeits it; and if granted by patent, he may be turned out by *scire facias.* 5 *Bacon*, 210, 212, tit. *Offices and Officers.* 9 *Coke*, 50, 98. For in every grant of an office, there is an implied condition that the grantee will diligently and faithfully execute the duties of it. Lord Coke says, in the *Earl of Shrewsbury's Case*, 9 *Coke*, 50, that there are three causes of forfeiture : 1. Abuser ; 2. Nonuser ; and 3. Refusal. The *first*, is where the sheriff or gaoler permits a voluntary escape, or abuses the prisoners, &c. ; or a forester or parker cuts wood, unless for necessary brush. The *second*, where the officer is concerned in the administration of justice, or of the commonwealth, and neglects to attend upon his duties; and the *third*, where he is bound to attend upon request, and refuses; in either case *the office is forfeited. Sickness is an excuse; but in  [ *208 ] the case of a *searcher* of a port, voluntary absence when search should be made, is not. *Cro. Car.* 491. And Lord Holt, held that the voluntary absence of a recorder of Ipswich, he holding a public office, was cause of forfeiture, though no inconvenience ensues. 2 *Ld. Raym.* 1237.

Mr. Hawkins doubts this, but adds, that he who so far neglects a public office as plainly to appear to take no care of it, should rather be immediately displaced than the public be in danger of suffering damage. 1 *Hawk.* 311, *b.* 1 *ch.* 67, § 1. Lord Mansfield, in *Rex* v. *Wells Corporation,* 4 *Burr.* 2004, said, that a general neglect, or refusal to attend the duties of a public office, is a reason of forfeiture, a determined neglect or wilful refusal, but a single instance of omitting to attend, when no particular business was expected, nor in fact happened, is a very different case. It is said that one negligent escape by a sheriff is not cause of forfeiture; but that one voluntary escape is; so of two or more negligent escapes. 5 *Bacon,* 210. 4 *Burr.* 2007. Thus it will be seen that the franchise of an office held upon the implied condition of diligently and faithfully executing the duties belonging to it, may be forfeited by general neglect, or wilful refusal to perform. The ingredient of a bad or corrupt motive need not enter into the cause; it is enough if the duty is neglected, or designedly omitted.

The hardship of exacting from corporations a fulfilment of all the requirements of the charter, has been urged upon us; but the appeal is made to the wrong forum. That is a question to be settled with the legislature that prescribed them. It is not for courts to say one condition is material, and must be performed on pain of forfeiture; and another is unimportant and may be dispensed with, or enforced by indictment or pecuniary penalty. Where shall we draw the line? The statute makes no such distinction; if corporations offend against "*any of the provisions of the act or acts creating*" them, the information may be filed, and judgment of ouster rendered. 2 *R. S.* 483, § 39. *Id.* 485, § 49. Besides, the hardship is no greater than in the case of individual grants, where in a court of law nothing short of performance, or the act of God, or of the grantor, will excuse [ *209 ] *the forfeiture. While this rule is steadily enforced against them, I do not perceive how we can deny its application to the case of a private association of individuals. If the condition is onerous, and unessential to the purposes of the charter, relief is plain, and at hand; the legislature will repeal it. While it remains on the statute book we are to presume it was deemed material by those who had a right to judge of the matter, and should be enforced. I speak now of *express conditions;* where they are *implied,* and of course undefined, except by construction of law, a more indulgent consideration may well be given; we are not then tied down to the letter of the statute. Their materiality to the great end of the institution may be regarded, and enter into the judgment of the court.

The remedy by repeal being thus plain and easy, I am unable to appreciate the force of the appeal on the ground of hardship, even if properly made to us. I desire to treat these institutions with all reasonable indulgence, consistent with the express injunctions of the law. Under proper regulations, they are often eminently useful instruments in the hands of citi-

zens to promote valuable and meritorious enterprizes, public and private; and at an early day, and even at this time, none more so than those instituted to construct our public thoroughfares, or less gainful to the corporators. But their usefulness as well as public favor depend upon an honest and faithful fulfilment of the duties they have assumed. It is the neglect of these, the failure to live up to the fundamental law of their being, that has mainly contributed to the doubt as to the wisdom of their creation, and the disfavor with which they are now regarded by many. Their own as well as the public interests will be best consulted by holding them to a strict accountability. The terms and conditions of their grant being settled and accepted, they ought not to be allowed to act beyond its scope and end, nor come short of it. Within this line of duty, their acts should be liberally expounded, and indulgently regarded both by the courts and the public.

For the above reasons, I am of opinion that the true construction of the statute authorizing proceedings against *corporations [ *210 ] by information, imposes the penalty of forfeiture on failure to perform *any express condition* annexed in the act of incorporation; that it is a *misuser* within the meaning of the 49th section, and would be so regarded even at common law, as a fundamental rule in respect to corporate bodies; and applying this principle to the issue upon the first twenty-four replications, it follows that the people are entitled to judgment, unless concluded by the *license* of the governor.

The 32d section of the General Turnpike Act, 2 *R. S.* 587, provides, that as soon as the company shall have completed their road, or any ten miles thereof, they shall give notice to the governor, who shall appoint three discreet freeholders not interested, to view the road and report to him, in writing, whether the same is completed in a workmanlike manner, according to the requisitions of the law. § 33. If they report in the affirmative, he shall grant a licence to permit the erection of so many gates on the road as shall be sufficient to collect the tolls authorized by law. It is insisted that this *report and license* are conclusive upon the people, (even in this direct proceeding to inquire into the matter;) that the road has been made agreeably to the terms of the charter; that the question is *res judicata*, and that the only ground for setting up a *misuser* to work a forfeiture, is a subsequent default as to repairs, &c.

After the best consideration I have been able to bestow upon the question, I am inclined to think the construction insisted on would give to the clause an effect beyond the intent of the legislature. It appears to me the object was simply to afford reasonable evidence of the completion of the work, before the exaction of toll should be allowed: for this purpose, the license is conclusive in favor of the company, but not equivalent to a general judgment on the writ of *quo warranto*. The proceeding is *ex parte* in respect to the people; it does not contemplate a contested trial, where the whole matter would be brought out for discussion and adjudication. True, the

governor may in some respects be regarded as representing the public interest, but his power and duty end in the appointment of the freeholders—it is made upon an *ex parte* application of the *company, without even the security arising from an opposing interest. It seems to me it would be an unsound as well as unsafe construction of the statute, under the circumstances, to give to the report of the freeholders the high and conclusive effect claimed. I am therefore of opinion that the people are entitled to judgment upon the demurrer to the first twenty-four replications, with the exception of the fifth, eleventh, seventeenth and twenty-third, which are not well pleaded. The facts as averred do not shew with sufficient certainty that the road was so constructed in any part of it as to require a *fender*.

I have said that the whole law on the subject of performance of conditions precedent or subsequent is reasonable, and within the ability of the company to perform. A *substantial performance according to the intent of the charter* is all that is required. Under the issues presented, this will be a question on the trial. If such a performance is shown, the defendants will be entitled to the verdict. The law in respect to individual grants on condition will afford familiar principles to guide the court and jury. Slight departures are overlooked. The leaning of the law is against the party claiming the forfeiture ; and if the failure is such as cannot be disregarded in a court of law upon settled principles, and has arisen from mistake or accident, the legislature will apply the remedy. They, and not the court, possess the dispensing power.

The demurrer to the remaining six replications I am of opinion is also not well taken. The first replication alleges, that the company erected gates and collected toll *before the license* of the governor was procured, and the others, that *after the license* more toll was demanded and received than was allowed by law. Either is an infraction of an express provision of the act of incorporation, and therefore within the mischief of the statute authorizing the information as already expounded. It was argued, that admitting the toll had been taken in violation of the charter, still it would only forfeit that franchise, and not all the franchises conferred. The rule at the common law is, that if the franchises are not dependent upon each other, the misuser of one does not *forfeit all ; Cruise,* 305, *tit. Franchise,* § 86 ; *Finch,* 165 ; and our statute may, I think, admit of a construction to a similar effect. 2 *R. S.* 483, § 39, 48. But the distinction is not worth contending for here ; the charter would be worse than useless to the company without this privilege. The right is so vital, and connected with the enjoyment of the grant, that a severance ought not to be permitted. It would be unreasonable to enforce the burthen imposed upon the company, after ousting them of the only countervailing benefit ; they would

New-York, May, 1840.—People v. Kingston and Middletown Turnpike Road Co.

not have assumed the one without the enjoyment of the other, and they should be deemed inseparable.

It was urged that the time for completing the road, as extended by the act of 1836, had not expired when the information was filed, and therefore this proceeding is premature. But the plea avers the construction and finishing of twenty-five miles of the line, as a part of the defendant's title to the franchises claimed. This is therefore a very material averment, and must be maintained. It is properly met and overthrown by the replications. It is too late for the defendants now to say they have a longer time to comply with the requirements of the charter. The franchises claimed and exercised, according to the plea, depend upon the completion of the twenty-five miles.

It is further urged that the legislature confirmed the road as constructed, by the act of 1836, (the act of 1834 passed before any part of it was made,) extending the time to complete it. They have not done so in *express terms*, and I am unable to perceive any such *implied intent*, in any of its provisions. 9 *Wendell*, 382, 3, 4.

It is made a point, that the six last replications should have concluded *to the country ;* but as they set up new matter in answer to the plea, and which went to overthrow it, they properly concluded with a verification. The defendants were entitled to an opportunity to answer by rejoinder if they could.

It was also said that the demurrer to the five last replications was mainly intended to raise and settle the construction of the act, whether the rate of tolls shall be in proportion to the *distance actually travelled*, or shall be determined *by the *distance between the gates* as located.   [ *213 ] The latter, I am of opinion, is clearly the rule intended by the act. *Statutes of* 1831, *p.* 49, § 5. By the section referred to, the company may erect the gates at such places as they see fit; but they can demand only " *the following rates of toll for every ten miles, and in the same proportion for a shorter distance,"* &c. This clause refers to the distance between the gates; if that be five miles, the corporation may demand *half* toll; if it be two and a half miles, they may demand a quarter toll, and so in proportion. 1 *Caines*, 182. There may be some ground for doubt whether the gates can be placed more than ten miles apart ; but as the places for the erection of gates are left at the discretion of the company, I am inclined to think the subsequent clause does not necessarily restrict the power conferred in this respect.

I am accordingly of opinion that the plaintiffs are entitled to judgment on the demurrer to all the replications except the *fifth, eleventh, seventeenth* and *twenty-third,* and as to those that the defendants are entitled to judgment; and that leave to amend on the usual terms should be given.

Mr. Justice BRONSON concurred.

Mr. *Justice* COWEN *dissented* and delivered the following opinion :

I had occasion to examine the principle on which the first 24 of these replications are founded, in *The People* v. *The Bristol and Rensselaerville Turnpike Company.*\* They each deny that the road was, at any time, either before or after the award of the commissioners and the governor's license, in some particular or particulars which they select, constructed or finished as the general turnpike acts requires. See the act as revised, 1 *R. S.* 584, 2*d ed.* I came to the conclusion there, that none of the deficiencies imputed, as existing anterior to the award, can be regarded, or have any operation as a ground of forfeiture ; the state being estopped by the award, &c. to aver that they ever had existence.

[ \*214 ]    \*I also thought, in the case cited, that according to the true construction of the general act, after the road is accepted by the state as complete, the company are not required to continue it, on pain of forfeiting their charter, in the *exact condition* by measure and shape, &c. required in the original construction ; and that, if the road be afterwards kept in *a reasonable state of repair*, their duty is discharged ; though I do not mean to say that the directions of the statute, in respect to the mode of construction, are to be entirely disregarded, in estimating what shall be deemed a proper state of repair. I think the replications, when they speak of a time after the company began lawfully to take toll, should, like an indictment for a nuisance, state either that the road had not been kept in repair according to the duty of the company, or that it was suffered to be out of repair, or had become inconvenient in some particular, contrary to that duty, stating wherein. It cannot be denied that, as it is their duty to construct, so they should continue mile-stones or posts, also guide-posts as required by the 21st and 22d sections of the statute, and, no doubt, negligence in this respect may be insisted on, as a ground for dissolving the corporation ; but it can not be, that they are absolutely bound, at all times, and against all hazards, to keep the road thus furnished. Should they decline to replace or repair such convenient things, in a reasonable time, after having notice that they were destroyed or defaced, that might be set down as a violation of duty. But an issue on the naked allegation, that the company had not, during all or any part of a given period, kept up a certain condition of things, must be found against them, if it should appear that, at any moment, or in any small particular, they had come short of it. To be full, the answer must be affirmatively : " We have, during the whole and every part of the time, maintained such and such erections, or kept the facing of gravel at such a depth," &c. and all this irrespective of neglect. Whereas if the state be put to charge that the omission was *wilful* or *negligent*, or *contrary to duty*, an issue would be formed as well upon the *legal quality* of the omis-

*\*See next case in this volume.*

sion, us upon the *act itself*. Why should not the state be required so to reply, that the \*defendants may plead not guilty, and    [ \*215 ]
put the attorney general to make out a *wrongful* or *negligent* violation of duty ?

But all this is, just now, no way material, if I am right with regard to the effect of the award, &c. The replications admit these awards, and by claiming to go behind them are bad. Being ill in this respect, can they be sustained for any part ? They may be if divisible, as against a demurrer to the whole. *Douglass* v. *Satterlee*, 11 *Johns. R.* 16.

The *fifth* replication here is also defective for the same reason that the tenth is so in *The People* v. *The Bristol and Rensselaerville Turnpike Company*. The 5th avers that where the road was not of full width, it was not furnished with a *fender*, &c. without stating that a fender, &c. was in fact any where required by the circumstance of the road being narrow.

Several other replications are, I think, in part or in whole, open to similar objections. To instance one, the *sixth:* it cannot be complained that guide boards were omitted at intersecting roads, without a distinct averment that there were, in fact, places of intersection. The facts which go to make up the condition of which the supposed duty arises, should be set out with all the exactness of pleading required in an action for a penalty. Sutherland, J. in *The People* v. *The Manhattan Co.*, 9 *Wendell*, 373, 5.

The *eleventh, seventeenth* and *twenty-third* replications are obnoxious to the same objections with the fifth.

But a general answer to the whole twenty-four replications is, I think, to be found in the statute of May 13, 1836, which provides that the time for completing the road " is hereby extended to the first day of November, A. D. 1839." This information was filed before that day, viz. in January, 1839. The information and the twenty-four replications, therefore, do no more than complain of the road being incomplete at a time when the company were in no wise bound to have it completed. The act does more than merely to recognize their existence as a corporation ; it, in effect, declares that they shall continue such and be excused from \*com-    [ \*216 ]
pleting their road, for several months after the information was
filed. Any failure in this respect is certainly not a substantive ground of forfeiture, however it might be when connected with the fact of receiving toll ; but no such *complex* ground is taken by any replication. Each must contain a perfect ground of forfeiture in itself. It relates to, and is but an essential incident of, the information ; but it is an essential incident for the purpose of explaining and fortifying the information and overturning the plea. If it present, whether alone or in connection with the plea, a case showing the information to have been premature, it is bad ; and both the replication and information must fall together.

The effect of the amendatory statute is, I think, the same with regard to the matter alleged in the twenty-fifth replication, which complains of taking

toll before any license was obtained from the governor, and before the act of 1836 was passed. A statute expressly giving time to complete the road, is equivalent to a renewal or confirmation of the original charter. All old offences are done away. This is so in the nature of things. To recognize a forfeiture incurred before the statute was passed, would defeat it altogether. The twenty-sixth replication is, moreover, equivocal as to the time it means to complain of; and I think, on the established rules of construction, must be considered as open to the same objections as the twenty-fifth It complains of taking excessive tolls *after* the time alleged in the plea that the defendants were *licensed* to erect gates in respect to the said part of the road alleged in the plea to have been *firstly constructed*. The license pleaded in respect to the part first constructed was obtained before the act of 1836, and the receipt of excessive toll, though after that, might still have been *prior to the statute of* 1836 ; and in cases of doubt the construction should be most strongly against the pleader. To escape the regenerating consequences of the statute, it was clearly necessary to show, by express averment, that any offence, whatever it might be, claimed as a cause of forfeiture, was committed after the statute passed. The statement of the day, viz. the 10th of August, 1838, though subsequent to the

[ *217 ] time of obtaining *the first license, which was in 1834, cannot be received as a discriminating averment. The day is entirely immaterial; it is usually considered mere matter of form, even in charging a crime. Proof may accordingly be given of an offence committed either before or after it. *The People* v. *Van Santvoord*, 9 *Cowen*, 655. There are exceptions to the rule, it is true, as where the day makes an essential part of the crime, or is pleaded as matter of description. But the taking of more toll than is allowed by the act might as well have been on some day before as after the statute of 1836.

This replication (the 26th) is also substantially defective for extreme generality and uncertainty in setting out the matter on which it relies. The averment is that the company took from A. B. C. more toll than they were legally entitled to, viz. more than after the rate of six cents for every score of sheep, &c. (literally copying the whole tariff of tolls from the statute,) for every ten miles, and in the same proportion for a shorter distance and less number of miles, and this the attorney-general is ready to verify, &c. The replication does no more than if it had referred to § 5 of the act of 1831, (the section prescribing the amount of tolls,) and then had said the company took from certain persons more toll than the section allowed. The whole is, in short, saying that the defendants took more toll from certain persons named than was allowed by law ; whereas the replication should have pleaded facts, viz. that a certain amount of toll was taken, going on and stating such specific act or acts of taking excessive toll, as were claimed to be a violation of the statute rate. A declaration upon a statute cannot stop with say-

ing generally that the defendant acted contrary to it, without showing wherein ; and the same rule is applicable to the replication in question. The replication in the case of the *City of London*, was of taking toll without any right, yet a certain sum per annum was mentioned. Where the charge is for taking excessive toll, the averment should be still more particular. An indictment for extortion against a sheriff, for taking too much by *way    [ 218 ] of mileage, is analogous ; the strictness of which may be seen in 2 *Chit. Cr. Law*, 292, *note*, *Amer. ed. of* 1836.

I have taken it, that, on the reason of the thing, the act of 1836, forgave all previous offences, and virtually declared the defendants a sound corpora. tion from that time. Much less was held sufficient to work this consequence as to a bank, in *The People* v. *Manhattan Company*, 9 *Wendell*, 351, 381. There statutes directing the public funds to be deposited in the defendants' bank, and to be continued by the comptroller, on payment of interest, were held to be sufficient. It is not competent for the state to answer that it did not know of previous forfeitures. If that were so, it should at least have been added in the replication, by way of avoiding the statute. But I deny that the state can avoid the effect of a statute waiver or pardon of this kind, by setting up ignorance or fraud. The very object is to waive, at all events, every flaw which may be supposed to have intervened by reason of any omission or irregularity. Such a statute should be holden equivalent to a judgment against the state, on verdict, or confession by the attorney general ; and I take it the legislature always mean that this kind of statute should have that effect. *See per Sutherland, J. in The People* v. *Manhattan Company*, 9 *Wendell*, 381, 2. The remarks of the learned judge, it is true, are, in that case, founded upon the circumstance of the state itself being a stockholder, voting for officers, and thus indirectly participating in the direction of the bank, during all the time when the offences complained of were committed. For these reasons, he thought the state should be estopped. But who ever heard of a legislative amnesty or pardon being avoided for ignorance or fraud, and the consequences of the crime being visited on the offender in the face of it ? Such a plea was, I believe, sometimes set up and acted upon in avoidance of general pardons, by weak and wicked princes, in the dark times of English history. Men were thus brought to the block, with a royal amnesty in their pockets, under pretence that the monarch had been surprised into forgiveness, by his subjects concealing from him the number or enormity of their transgressions ; and, for aught I know, *Great Britain may still retain such a head of bar    [ *219 ] barous policy in her code, though I imagine she would be very cautious in exercising it, unless upon her distant and depressed colonies. But even there a legislative amnesty could, I suspect, hardly be impeached under such a pretence. The objection may be predicable against state patents, grants or contracts, but to allow it against a statute passed for the pur-

pose of keeping a corporation on foot, or other statute operating as a general amnesty or a waiver of forfeitures, would be in all cases to violate the intent of the legislature.

The remaining four replications allege certain acts of taking toll, which may perhaps be taken as showing by express averment to have been done after the time, as fixed in the plea, when the last of the governor's licenses was granted. That time was after the passing of the statute of 1836. These replications set forth various specific instances in which the company demanded and received, as the replications insist, more than at and after the rate of toll allowed by their charter ; e. g. in the 27th replication, as to four wheeled waggons, *more than at and after the rate of twelve and a half cents for every ten miles, or in the same proportion for a shorter distance* or less number of miles, viz. *six cents for every three and three-fourth miles, whereas they were not, for this, entitled to more than four and eleven-sixteenths cents.* Again in the 28th ; the complaint is that they took, for *one horse waggons six cents for five miles,* whereas they were entitled to only six cents for ten miles ; and so of the 29th and 30th, in respect to toll for other vehicles. In short, these four last replications insist, in effect, that the passenger is bound to pay, at whatever gate he passes, the toll allowed by the charter, *only* at the rate of his actual travel, after entering upon it, not according to the general rate of toll imposed for each gate according to its distance from another gate.

By the general turnpike act, 1 *R. S.* 587, 2*d ed.* § 33, the governor is to permit the erection of so many gates on the road reported to him as shall be sufficient for the collection thereon of the tolls authorized by law. This is but a repetition of the powers conferred by the statute of 1807, § 6, *continued in the revisal of 1813, § 6. The gates may of course be distant from each other more or less than ten miles. Then comes the charter in question, *Sess. Laws of* 1821, *p.* 49, § 5, which provides that this company may erect gates, &c. and demand and receive certain *rates* of toll for *every ten miles,* and *in the same proportion* for a *shorter distance* or *less number of miles.* The replications leave it to be taken as admitted that this *proportion* was fixed according to the distance of the gates, and merely find fault that it was not limited to the distance of actual travel, as five, three, one mile or half a mile. Such a construction would leave every traveller to estimate his own toll and make it utterly impracticable for the toll-gatherer to perform his duty. It would lay him open to continual imposition. On a clause similarly framed, therefore, in *Stuart* v. *Rich,* 1 *Caines,* 182, it was held that the words, *and so in proportion for* [any greater or ] *lesser distance,* should be applied to the distance of the *gates,* not of actual travel. There is no pretence that the defendants have not been governed by that construction ; having established gates with proper general rates of toll at each, accordingly as their distance may be ten miles or less from each other.

[ *220 ]

New-York, May, 1840.—People v. Kingston aad Middletown Turnpike Road Co.,

But admitting that such a construction of this particular charter were erroneous, it would be quite rigorous to insist on the total forfeiture claimed, without even averring that the company acted *knowingly*, *wrongfully*, or *in breach of their trust*. Surely the receiving of too much toll under an honest mistake of right is not enough. The toll-gatherer or company would, in such case, no doubt be liable *civiliter*, to refund the money improperly exacted. So might any trustee be made liable in various ways *civiliter*, as for a mispayment to a wrong person, or on wrong principles. But this is quite different from a general forfeiture of the trust, or even accountability to the principal or *cestui que trust* on the ground of *negligence*. An auctioneer or broker fails to consummate a sale by reason of a doubt upon the statute of frauds, *Hicks* v. *Minturn*, 19 *Wendell*, 550 ; an attorney mistakes on a question of doubtful practice, or the like, *Reeve's Dom. Rel.* 373 ; they would not be liable even in an action by the principal for negligence. A trustee *commits a like mistake ; shall he therefore forfeit his office ?   [ *221 ] Should not the attorney general, therefore, be put to say here, as

was done in the case of the city of London, cited with regard to this question, in *The People* v. *The Bristol and Rensselaerville Turnpike Company*, that the taking of the toll was *wilful* and *in breach of trust ?* I am not prepared to admit that the naked fact of taking too much toll shall forfeit the charter. A bank, by mistake or misconstruction of law, takes more interest than is allowable by law ; its charter is not therefore gone. In *Slee* v. *Bloom*, 5 *Johns. Ch. R.* 381, Chancellor Kent admits that, according to *The Commonwealth* v. *The Union F. & Mar. Ins. Co.* 5 *Mass. R.* 230, a corporation would incur a forfeiture of its charter by omitting to collect subscriptions to its stock. But would this be so, if the failures were owing either to misapprehension of law or fact, or any unavoidable impediment in the way of collection ?

A similar question was examined by Sutherland, J. in *The People* v. *The Manhattan Company*, 9 *Wendell*, 373 ; and his conclusion was, that in order to show a ground of forfeiture for non-feasance, the attorney general was bound to state all such facts as were material to put the corporation in default ; and he cites cases on pleading justifications in actions for libel, as illustrating the degree of strictness required. In the case before him, the fault alleged was that the defendants had not complied with a *condition subsequent*, by which they were bound to furnish water to the city of New-York, for the use of such citizens as were willing to agree for and take the same. It was held necessary to show that some one, at least, was willing and desirous, and gave notice that he was so, and made a request to be supplied with water ; and that the company disregarded such notice and request. He said the case was of a penal character, in which the forfeiture of most valuable and important franchises was sought to be established ; and added

*Com. Dig. Plead.* (*c.* 76,) with several other books exemplifying the strictness required in declaring for penalties.

But it is unnecessary to pursue the inquiry on the form of the [ *222 ] replications; for I think there cannot be a serious doubt *that the case of *Stuart* v. *Rich,* applies. I concede that a corporation *wilfully* and *knowingly* taking a toll not due, or more than it ought, under pretence of its corporate powers, incurs a forfeiture of its charter, whatever other remedies may lie for the offence; but such a case has not been made out by the replications in question.

On the whole, I am of opinion that there should be judgment for the defendants on the demurrers, to all the replications. But my brethren differing from me except as to the fifth, eleventh, seventeenth and twenty-third replications, there must be judgment for the people on the demurrers to all the others.

Judgment accordingly.