GREEN and TALMAGE, Receivers, &c., *v.* A. SEYMOUR and others.

A corporation cannot enforce a mortgage which it has obtained by a transfer, taken contrary to the express provision of its charter.

The mortgagor may avail himself of such illegality, and thereby show that the corporation has no valid title to the mortgage.

A corporation which has discontinued its business pursuant to its charter, cannot resume it without the sanction of the legislature.

A statute relating to a corporation, which required an acceptance of the act to be filed, or else to be void, was never accepted.—*Held*, that the corporation could not derive any advantage from the passage of the act. At most, the act during the time for accepting it, could only be deemed a recognition of the lawful existence of the corporation as it was previously.

The charter of an insurance company provided, that if on any anniversary day of electing its directors, stockholders owning two-thirds of the whole amount of the stock subscribed, should vote to discontinue its business; the directors should cease forthwith from doing any new business, or operations of any kind, except to accelerate closing its concerns; and they were to wind up its affairs as soon as might be. After transacting business three years, at the annual election of di-

rectors, more than two-thirds of the outstanding stock voted to discontinue the business of the company. The company then owned about a third of its stock, on which there was no vote. The directors proceeded to close its affairs, and had completed the work, except in respect of a few doubtful debts, and some unsaleable real estate ; when six years after the vote, the company commenced the business of discounting notes and circulating its checks, in the similitude of bank notes. In this business the corporation became the holder of sundry promissory notes, and a mortgage was subsequently assigned to it by the maker, as collateral security. In a suit by the receivers of the company, to foreclose the mortgage, *held*—

1. That the vote was a sufficient compliance with the charter, to work a discontinuance of the business of the company.

2. No previous notice of the intention to take a vote on the question, was necessary.

3. The stock owned by the corporation was properly excluded, in computing the vote of two-thirds of the stock subscribed.

4. That the resumption of business by the corporation was unlawful ; although its corporate existence continued for the purpose of closing its old affairs. And

5. That the mortgage could not be enforced in its behalf.

   October 10, 11, 15, 1845 ; February 20, 1846.

THE bill in this cause was filed, October 26th, 1842, by Henry Green and Thomas G. Talmage, as receivers of The Utica Insurance Company, to foreclose a mortgage on lands in Westmoreland in the county of Oneida, executed by Asaph Seymour to Russell Clark, to secure $1400, dated December 1, 1817, and assigned to the Utica Insurance Company, October 30, 1827.

The defence was, that when the company took the mortgage, the act was illegal, because by law it could transact no business of that kind ; that the mortgage was taken in violation of the restraining act, and therefore it cannot be enforced in behalf of the company ; that the mortgage had been paid and satisfied to the mortgagee ; and some subordinate grounds.

The testimony on these points was very full ; but all that need be stated on this occasion, will be found in the opinion of the court.

*W. Curtis Noyes,* for the complainants.

*J. F. Seymour* and *C. P. Kirkland,* for the defendants.

THE ASSISTANT VICE-CHANCELLOR.—The fifth section of

the act incorporating The Utica Insurance Company, provides that if, on any anniversary day of election for directors, the *stockholders owning two-thirds of the whole amount of the stock* subscribed to the corporation, should vote to discontinue the business of the corporation, *it should be the duty of the directors to cease forthwith* from assuming any new risk of insurance, *and from doing any new business, or operations of any kind whatever*, excepting such as might tend to accelerate the closing of the concerns of the corporation. It was also made the duty of the directors, as soon as might be, to dispose of all its property, collect its debts, discharge all the claims against the corporation, and divide the residue among the stockholders; and upon this being accomplished, it was declared that the corporation should cease and be dissolved. (Laws of 1816, ch. 52, p. 47, §§ 5 and 6.)

The company transacted business under this act till the sixth day of July, 1819. On that day the capital stock outstanding and held by stockholders, was 1280 shares, on each of which shares, $70 had been paid in. The residue of the capital stock mentioned in the charter, 720 shares, was owned by the company, having been received in payment of debts due to the company, and otherwise.

The sixth of July, 1819, was an anniversary day for the election of directors of the company, and at the election on that day, stockholders owning 1037 of the 1280 outstanding shares of the company, voted in pursuance of the 5th section of the charter, to discontinue the business of the company.

The directors proceeded to dispose of the property, pay the debts of the company, and divide the proceeds. On the 1st of September, 1819, they adopted a resolution, to receive shares of the stock at $60, in payment of debts, and on the 23d of September, they directed their secretary to sell at auction the furniture of their office, and it was sold accordingly. Their banking house, after being advertised for sale, was turned into a dwelling, and leased for that purpose, and subsequently was occupied as a school house. Their loans were called in and collected. The directors paid a dividend of the capital stock, amounting to twenty per cent. on the first of March, 1820, ten per cent. on the

15th of April, twenty-five per cent. on the 15th of June, six dollars on a share on the 8th of September, and two dollars and fifty cents on a share on the 7th of December, 1820. In the whole, $59 on each share of the capital, was returned to the stockholders in dividends, the last of which was made on the 3d of May, 1821.

In short, as was testified by Mr. Johnson, (who in 1819 was their secretary and treasurer,) the directors, in pursuance of the vote of the stockholders on the 6th of July, 1819, from that time ceased from assuming any new risk, business or operation, except such as tended to accelerate the closing of the concern, and took measures to close it as speedily as possible. The debts of the company were paid, and their bank notes were destroyed as fast as they were returned. Their outstanding risks were taken by an insurance company in New York. In May, 1823, the whole effects of the company had been distributed, except a few outstanding debts due to them, from which the directors expected to realize only a small sum, and their banking house and lot in Utica, which they had endeavored for three years to sell; but without success, though it had been offered at auction, for less than half its original cost.

All the stockholders who voted for directors at the election in July, 1819, voted to discontinue the business, and it does not appear that any stockholder ever dissented from, or disapproved of, that vote, or of the subsequent proceedings of the directors to wind up the affairs of the corporation.

Thus in 1823, the Utica Insurance Company had ceased to exist, for the original purposes of its charter, as entirely as if it had been dissolved by a decree, or its charter repealed by the legislature.

So far, its affairs had been mainly conducted in Utica, which was the place evidently contemplated by its charter, as the sphere of its operations.

In 1825, the venue was changed. On the 29th of March, a meeting of the directors was held at the Company's office, in New York, at which the engraved checks of the company for $50,000, were directed to be signed by the president and secretary for emission. It appears that the direction of the business from that

Green v. Seymour.

time, was in New York, although an office was kept in Utica ; and the company early in 1825, commenced and for several years, pursued the business of banking, both in New York and Utica, discounting bills and notes, and circulating their engraved checks in the form, for like sums, and in the similitude of the circulating notes of the chartered banks.

In the course of this business, the company became the holders of certain notes, on which Russell Clark was a party as one of the makers. One of the notes was first in their possession in July, one in August, and another in November, 1825. They were all discounted by the company for the parties, and the testimony is strong, that the proceeds were paid to the borrowers in the circulating checks before mentioned. The mortgage in question in this cause, was transferred by Russell Clark to the company in 1827, or 1828, as a collateral security to the debt thus originated ; and in October, 1842, this bill was filed by the receivers to foreclose the mortgage.

The defendants insist that the Utica Insurance Company in 1825, was dissolved, and had no legal existence as to this transaction ; it had no power to make such contracts, or to obtain a title to this mortgage, and that it never had any title to the mortgage.

There was much discussion at the hearing on the point, whether there was a total or partial dissolution of this company. I think it is unnecessary to determine that question. There was an unquestionable corporate existence, and capacity to sue, till 1836, in reference to the transactions prior to July 6, 1819, and to the necessary and reasonable incidents to closing its affairs after that date.

The complainants insisted that the vote in July, 1819, was not a vote of the stockholders, owning two thirds of the capital stock. That the 720 shares owned by the corporation ought to be taken into the account. But this is not correct. Those shares were merged, for the purposes of this vote. The stockholders owning the 1280 outstanding shares, owned the whole corporation, and all its effects. They were the owners of the whole amount of the capital stock which had been subscribed to the corporation, and a vote of two thirds of the 1280 shares,

would have been a full compliance with the fifth section of the charter. *Ex parte Holmes*, (5 Cowen, 426,) is in principle decisive of the question.

It was also urged, that previous notice should have been given, of the intention of bringing forward the subject of discontinuing the company's business. The answer to this is, that the charter required no such notice. Its permission to take such a vote on any anniversary day of election for directors, was a standing notice to the stockholders, that on any such day the question might be agitated and disposed of. Besides, the large vote for discontinuance, and the silence and acquiescence that followed, furnish strong evidence, that all the stockholders concurred in the measure.

As to the banking business alone, being within the vote of the stockholders, there is no such limitation in the vote itself, or in Mr. Johnson's proof of it. Nor was the subsequent cessation of business, confined to that department. The directors alone might have discontinued banking. The vote of the stockholders under section fifth could not be taken upon a partial discontinuance of the business.

Then what was the the effect of this vote to discontinue the business of the company?

The charter says, " it shall be the duty of the directors forthwith to cease from doing any new business whatever." In other words, it prohibits the company from discounting notes, making loans, or assuming risks of insurance, from that day forward, except to accelerate the closing of its concerns. There is no testimony, nor is it claimed, that the transactions with Russell Clark in 1825, and subsequently, had any connection with the old business of the corporation, or tended or were designed to accelerate the closing of its concerns.

The charter did not grant to the directors or the stockholders, any power to reconsider their vote to discontinue business, or to revoke the decision thereby made. When once made by the requisite amount of the stock, it was final, and irrevocable except, by the legislature. The persons who resuscitated this company in 1825, did not set up or attempt to exercise any power of revocation. It seems that they sought to obtain an indirect legisla-

Green v. Seymour.

tive sanction for going on; but failing in that, as I will presently show, they proceeded with a cool disregard, both of the vote of 1819, and the sovereign power of the state.

On the 13th of April, 1825, an act was passed making various provisions relative to the Utica Insurance Company, among others prohibiting it from banking, and from keeping an office elsewhere than in Utica. It required the corporation to file an acceptance of the act with the secretary of state, within six months, or else the act was to be void. (Laws of 1825, Chap. 193, p. 218.) The corporation did not file any such acceptance, and its directors voted that they would not accept it.

Still it is contended by the complainants, that the passage of this act was an admission of its full corporate existence by the sovereign power.

As to this position, until the corporation accepted it, the act could not be deemed a recognition of any more than its actual and lawful existence; and it was a living corporation for many purposes, at that time. It could sell and convey its real estate, collect its old debts, and divide its remaining assets among its stockholders. But the act itself became void, by its non-acceptance, and it is therefore precisely as if it had never been enacted. The company could derive no advantage from it in any form, except by accepting it unconditionally. (See Angell & Ames on Corp. 51, 54, 2d ed. Chapt. 2, s. 7; *The King* v. *Westwood*, 2 Dow. & Clark P. C. 21; *The People* v. *The Kingston and Middletown Turnpike Road Company*, 23 Wend. 193.)

The act of May 26, 1841, which was also relied upon, does not aid the complainants. It authorized the court of chancery to appoint receivers of this corporation, and vested them with all the property which it had when its charter expired. (Laws of 1841, Chap. 318, p. 307.) It did not grant directly or indirectly, any rights to the receivers, which were not possessed by the corporation itself when its existence terminated. And as a recognition it goes no farther than I have already assumed, viz. that it had a legal existence for many purposes until 1836.

The question remains, did the Utica Insurance Company

acquire a title to this mortgage, which they can enforce against the defendants?

The discounting of the notes in 1825, and the receiving the assignment of the mortgage, were acts which the legislature had prohibited to this corporation. They were therefore unlawful. But it is said that these defendants have no right to object; the sovereign power of the state has never interfered, and the original debtors to the corporation, instead of striving to avoid their obligations, sought to pay them by this assignment. The cases cited in support of this view, were those in which the forfeiture of corporate franchises was set up to defeat a recovery, or in some other mode, the continued existence of the corporation was questioned collaterally.

This is not such a case. It is not denied that this corporation was in existence, and could maintain suits till 1836, although its charter might have been forfeited at the instance of the people, many years before.

The question is, whether the corporation obtained any title to this mortgage. The objection to their title, is not that they had forfeited their charter, but that the title was obtained by a positively illegal act.

I confess that I cannot perceive any escape from the objection. The title of the complainants was open to be contested by the defendant. When it is proved, it turns out that it was obtained by taking a transfer, which the law had expressly prohibited. I do not see how a valid title can be made by such an illegal transfer. And in order to enforce these securities, this court must lend its powers in aid of a direct violation of law.

That cannot be permitted; and the result is that the complainants, standing in the place of the Utica Insurance Company, are not entitled to enforce the bond and mortgage in question.

This conclusion renders it unnecessary for me to look into the question as to the competency of Mr. Clark as a witness, or any of the other points which were so fully and ably discussed at the hearing.

The bill must be dismissed with costs. One of the receivers from his long connection with the company, commencing in 1824, must have known of the vote in 1819, and the subsequent

closing of its affairs, and is thus chargeable with notice, that the whole proceeding in discounting Russell Clark's notes, and its sequel, were in violation of the act of incorporation. The complainants on this ground, without regard to others that might be mentioned, must pay costs.