THE PEOPLE, *ex rel.* William R. Barton and John Ames, *vs.* THE RENSSELAER INSURANCE COMPANY and EUGENE HYATT, receiver, &c.

Premium notes, taken by a mutual insurance company, upon policies already issued, and payable not at the end of or within twelve months from date, but in such portions and at such times as the directors shall require, are not sufficient to constitute a basis of capital for the renewal or extension of the corporation under the act of 1849. (*Laws of* 1849, *chap.* 308.)

It will not be *presumed* that notes in that form were contributed and designed for the purpose of constituting a basis of capital, but such intention must be *proved* by satisfactory evidence.

The use of such notes by the directors for the purpose of extending the charter of the company, under the act of 1849, being radically different from the purpose for which they were originally given, and for which they were intended to be used, it is an unjustifiable *diversion* of the notes, which will constitute a defense on the part of the makers to their enforcement, if attempted without the occurrence of any assessment; unless a consent was given to such diversion.

The certificate of the comptroller, specified in the 11th section of the act of 1849, confers upon the company only an apparent and *prima facie* right to enter upon the business of insurance. It was not intended and has not the effect to commit the state, by an official and conclusive admission on its part that the company is absolutely entitled to the exercise of corporate privileges for thirty years; and was not designed to be a bar to an action in the name of the people brought for a dissolution of the company for non-compliance with the conditions precedent to its valid incorporation.

An act of the legislature, authorizing a fire insurance company, on certain conditions, to take marine risks, is not a legislative recognition of the valid incorporation of the company, under the act of 1849.

The appointment of a receiver of an insurance company, by the court, and

the consequent partial assumption and control by the court of the affairs and funds of the company, is not a judicial recognition of the due incorporation of the company, or an estoppel upon proceedings for a violation of the law of its existence.

Notwithstanding a receiver of an insurance company has been appointed, on account of its alleged insolvency, the corporation is to be deemed *acting* as a corporation, for the purpose of authorizing an action to be brought against it, under the 3d subdivision of section 432 of the code.

If a corporation does not comply with the fundamental requisites of the act creating it, it *offends* against its provisions and is liable to an action, under section 430 of the code, for the purpose of vacating the charter or annulling the existence of the corporation.

When a judgment is pronounced against an insurance company, adjudging it to have no legal existence, and directing its charter to be vacated, the receiver of the corporation will be prohibited from bringing any new suits; but the court will not, in such action, interfere with suits already instituted and in progress; but will leave the parties in such suits to apply therein for a stay of proceedings or other relief.

THIS action was brought for the purpose of vacating the charter of the Rensselaer Insurance Company, and to prohibit the company from further acting as a corporation, and to restrain the receiver from further action in the collection of the notes held by him, belonging to the company. The action was tried at the Rensselaer circuit. The following facts were found by the justice before whom it was tried: That the Rensselaer County Mutual Insurance Company was incorporated by an act of the legislature, passed April 29, 1836, for the purpose of making insurance upon buildings and other property against loss or damage by fire. That said corporation went into operation soon thereafter as a mutual insurance company, and continued to do business as such until the 17th day of October, 1851. That on or about the 29th day of September, 1851, the directors of the company presented a certain proposed charter and declaration to the attorney general of this state, for the purpose of extending the original charter of said "Rensselaer County Mutual Insurance Company," to the time specified by the provisions of the act, entitled "An act to provide for the incorporation of insurance companies," passed April 10th, 1849; which

The People *v.* Rensselaer Insurance Company.

declaration was under the corporate seal of the company, and was signed by the president and all the directors thereof. That previous to the presentation of said charter and declaration, and on or about the 31st day of December, 1850, the directors of said company gave their consent in writing, subscribed by them, to such extension of the charter of the company, and published notice of the intention of said company to extend its charter, in a newspaper, as required by the act of 1849. That thereupon Levi S. Chatfield, then attorney general of said state, made a certificate, and the comptroller appointed commissioners to make an examination of the capital, securities and affairs of said company, as stated in the complaint. That such commissioners made a certificate and annexed thereto an affidavit, as stated in said complaint. That upon said certificate and affidavit being presented to him, on the 15th day of October, 1851, the said comptroller made a certificate in substance that it appeared from the report of the commissioners that the company had received and was in the actual possession of premium notes, based on applications for insurance, to the full extent required by the fifth section of the act of 1849, to wit, $100,000. That on the 15th of October, 1851, the said charter and certificate were filed in the office of the secretary of state of this state, and on that day a certified copy thereof was made, under the seal of said office, and the same was filed in the office of the clerk of the county of Rensselaer on the 17th October, 1851. That by the terms of the charter last mentioned, the village of Lansingburgh, in the county of Rensselaer, was named as the place where the office of the said company should be located, and where the general business of the company should be conducted and carried on; that the corporate name thereof should thereafter be "The Rensselaer Insurance Company;" that its charter should be of thirty years' duration; that its business should be conducted on the plan of mutual insurance, for the purpose of making insurance against loss or damage by fire and risks of inland navigation

and transportation, as provided in the second subdivision of the first section of the act of April 10, 1849. That any person applying for insurance might pay a definite sum in money, to be fixed by the board of directors, in full for said insurance and in lieu of a promissory note. That the company continued doing business during the application and proceedings for the extension of its charter. That it continued business and issued policies at the time of the extended charter, which was filed the 17th day of October, 1851. The first meeting of the board of directors of said company, entered upon the books after the filing of the extended charter, was held October 23d, 1851. Four policies were issued between October 16th and October 24th, 1851, viz: one on the 20th, two on the 21st and two on the 22d of October, 1851. That it did business and issued policies in the name of the Rensselaer Insurance Company, and after its reorganization acted under and in pursuance of its extended charter. That said company did a large business, and issued policies upon both the note and cash plan, but it took no inland navigation or transportation risks. The said company continued to do business till about the 1st day of February, 1855. That the capital upon which said company obtained an extension of its charter was its premium notes on hand, taken for policies already issued, and upon no other capital. That previous to the extension of the charter of said company the directors caused a printed circular, in which, among other things, it was stated that they intended to take steps to procure such extension, to be sent by mail to each member of said corporation according to his or her post-office address, as contained in his or her application for insurance. That by the charter and by-laws of said corporation it is provided that an annual meeting of the members thereof shall be held at its office, in the village of Lansingburgh, on the first Monday of June in each year, of which notice is required to be published. At which annual meetings directors are to be elected for the ensuing year, and such other

business transacted as may be brought before them. All of which annual meetings, down to the time said company stopped business, were held, notice thereof being duly published. That no objection was ever made by any member of said corporation at any or either of said annual meetings, or any other time or place, to the extension of said charter, or the proceedings had therefor; that such extension was generally known, but it did not appear that the makers of such notes knew or consented to their use for such extensions, otherwise than is to be inferred from said printed circular. That in 1852 (*Laws of* 1852, *chap.* 313) the legislature passed an act amendatory of the extended charter of said company. That on or about the 19th day of January, 1853, the company issued a policy of insurance to one Thomas Shaughnessy, insuring his dwelling house, situate in the city of Troy, against loss or damage by fire. That said dwelling house, during the life of said policy, was burned, and a judgment obtained by said Shaughnessy against the company for said loss, in the supreme court, on the 26th of December, 1854. That an execution issued on said judgment to the sheriff of the county of Rensselaer was returned by him wholly unsatisfied, on or about the first of February, 1855; whereupon said Shaughnessy brought an action in this court, on behalf of himself and all others similarly situated, for the sequestration of the property and effects of said corporation, the appointment of a receiver thereof, and the application of the same to the payment of its debts. And such proceedings were thereupon had that the defendant Hyatt was by the judgment and order of this court, bearing date the 19th day of February, 1855, appointed such receiver; that he gave security as required, and immediately entered upon his duties as such receiver, took possession of the property and effects of the corporation, ascertained its liabilities, and proposed an assessment of its premium notes towards their payment, which was sanctioned by this court, and directed to be enforced and collected, by an ex

parte order bearing date the 10th day of November, 1855. That the liability of said company for losses, at the time of the appointment of said receiver, was about $100,000. That its assets at that time, which came to the hands of the receiver, consisted entirely of premium notes which, if all collected, would produce about the sum of $65,000. That the corporation had done no act since the appointment of said Hyatt as its receiver, and the defendant Hyatt had done nothing except in pursuance of the order of the court aforesaid appointing him such receiver; that in the performance of his duties, as such receiver, he had brought numerous actions in this court for the purpose of enforcing the payment of said assessment, most of which are now pending. That said actions are upon notes given to said company, both before and after it extended its charter. This action was commenced on the 23d of October, 1861.

The justice found and decided, as conclusions of law, that the proceedings had before the extension of the charter of the Rensselaer County Mutual Insurance Company were insufficient for that purpose, and that its charter was not extended. That its premium notes taken for policies issued, payable as assessed and requiring assessment, were not capital premiums or engagements of insurance within the meaning of the act of 1849, and that said company could not use said notes as a basis for extending its charter. He therefore directed a judgment to be entered adjudging and decreeing that the corporation was not extended by the proceedings had for that purpose, and never had any legal existence under said extended charter; and that the said extended charter and the existence of the said corporation under the same be annulled, and said extended charter vacated.

*E. F. Bullard, C. J. Lansing, D. L. Seymour* and *C. R Ingalls,* for the plaintiffs.

*W. A. Beach* and *C. F. Tabor,* for the defendants.

HOGEBOOM, J.  To entitle a mutual insurance company to commence business as an incorporation, under the act of 1849, (*Laws of* 1849, *chap.* 308,) agreements for insurance must be entered into, the *premiums* on which shall amount to $100,000, and notes received therefor in *advance* payable at the end of or within twelve months from the date thereof. (*Sec. 5.*)  These notes constitute the capital stock, or part of it, and by the same section are to be deemed valid, negotiable and collectible for the purpose of paying any losses which may accrue or 'otherwise.

By section 14 of the same act, existing mutual insurance companies were permitted to *extend* their original charters to the time specified by the provisions of said act, (which was thirty years, section 15,) by altering or amending the same so as to accord with the provisions of said act, filing the same together with a declaration of its directors of their desire for such extension, and the unanimous consent of the trustees as required by the act, and thereupon the *same proceedings were required to be had* as were necessary to the organization of original companies under said act.  That is, a charter was to be prepared, submitted to and approved by the attorney general, and an examination had by or under the direction of the comptroller and the certificate of himself, or commissioners appointed by him, to make the examination obtained, that the company "has received and is in actual possession of the *capital premiums* or *engagements* of insurance, as the case may be, to the full extent required by the fifth section of the act."

No *capital* is mentioned under the 5th section of the act, other than that derived from the before mentioned notes received in advance for the premiums on the risks of insurance.  No *premiums* are mentioned, except those last referred to, which I understand to be premium notes given for insurances made or contemplated by the makers thereof. Very possibly it would not be a violation of the statute to receive cash to an equivalent amount in lieu of the notes

which would fall due at the end of a year if not sooner, and might thus necessarily place *cash* in the hands of the company, which, together with any funds accumulated in its business, by another section (8), is authorized to be invested in bonds and mortgages. Nor are engagements, by that designation, mentioned elsewhere in the act. I construe them to mean *agreements* or accepted applications for insurance.

Existing companies, then, desiring to obtain the advantages of this act, and to extend their charters under it, must be possessed of the elements of capital to the full extent required by the fifth section of the act, and I think of the *nature* required by that section, because the same proceedings were by the fourteenth section to be had for extending the charter of existing companies as were required in the case of original companies, for their organization. Moreover, as the act of 1849 adopted several features in regard to the constitution of those companies—particularly in regard to the notes forming the capital—essentially different from those which had therefore prevailed, and was apparently designed to institute a new and uniform mode of organization for the future, it would seem as if the legislature intended that all companies who desired to obtain the benefit of its privileges should substantially conform to the fundamental conditions of organization. I do not think the language of the fourteenth section admits of any other plausible or reasonable interpretation, especially when taken in connection with the provision at the close of the section for changing a mutual company into a joint stock company, which it says may be done "by proceeding in accordance with, and conforming their charter to, the provisions of this act."

I do not think the notes presented by the Rensselaer Mutual Insurance Company to the commissioners appointed by the comptroller, and relied upon by the company as the justification of the attempted extension of their charter,

were such as were contemplated or required by the act of 1849. 1. They were entirely different in form, time of payment and contents from those described in the act of 1849, as the basis of capital. The latter were to be payable at the end of or within twelve months from date, were to be immediately negotiable and collectible, and were to be deemed payable absolutely; (*White* v. *Haight*, 16 *N. Y. Rep.* 324; *Dana* v. *Munson*, 23 *id.* 566;) the former were to be payable in such portions and at such times as the directors, agreeably to their charter and by-laws, should require, were not payable absolutely, but only in the contingency of a loss, and then only upon a regular assessment made by the company pursuant to their charter and by-laws. It is true, notes in the latter form have been held sufficient to constitute capital under the act of 1849, where the evidence is satisfactory that they were contributed and designed for such a purpose; (*White* v. *Haight*, 16 *N. Y. Rep.* 310; *Dana* v. *Munson*, 23 *id.* 566; *Sands* v. *St. John*, 36 *Barb.* 635;) but presumptively this is otherwise; (*Dana* v. *Munson, supra ; Birdseye* v. *Smith*, 32 *Barb.* 217; *Sands* v. *St. John, supra;*) and there is no evidence whatever in this case that they were designed for any such object. On the contrary, the evidence is clear and unquestionable that they were given wholly under the act of 1836, and as a contingent fund to pay losses as they should be assessed from time to time, as such losses should occur; and not as a present capital, payable absolutely at their full amount, and liable to be immediately converted into cash at the pleasure of the directors.

2. The object for which they were originally given and for which they were intended to be used, being radically different from that to which they were appropriated by the action of the directors in the attempted extension of the charter, I think it was an unjustifiable *diversion* of the notes from the purpose for which they were made, and that this would constitute, in the hands of the makers, a legal defense against their enforcement if attempted without the occurrence of and

assessment for losses as provided by the charter of 1836, unless a.consent was given to such diversion. (*Bell* v. *Shibley*, 33 *Barb.* 610. *Dana* v. *Munson*, 23 *N. Y. Rep.* 568. *Beers* v. *Culver*, 1 *Hill*, 589. *Oliphant* v. *Mathews*, 16 *Barb.* 608.) And this I should think was never given. The notice sworn to have been sent by mail to each member of the company was not very specific in its character, and certainly did not express any design to use these notes as the basis of capital under the act of 1849; is not shown to have.reached a single individual member of the company; and the mode of service is not of that kind from which its receipt by the members was necessarily to be inferred. To justify a diversion of a note from the purpose originally intended, the evidence of consent thereto should be clear and explicit, not doubtful or liable to misconstruction.

3. It is also, perhaps, worthy of consideration whether the provision in section 8 of the charter of 1851, for graduating the *amount* for which the note shall be given, and the times and mode of payment thereof by the determination of the directors; and further *exacting* the payment of such *cash* premium as shall be required by the by-laws of the company, (which by section 11 of the by-laws·is fixed at 5 per cent of the note given for the premium;) and further providing that " any person applying for insurance may pay a *definite* sum to be *fixed by the board of directors* in *full* for said insurance, and in lieu of a promissory note;" is not inconsistent with the 5th section of the act of 1849, which provides for a sum to be fixed by the applicant, and which is payable absolutely and at a specific time, and to be in the shape of a note, (to be taken out in premiums,) and to be at the absolute control and the absolute property of the corporation, and not a mere *contingent* fund for.the payment of losses, and whether such note is not on account of such inconsistency void. But perhaps this point has been wholly or partially disposed of by the decision of the court of appeals in *Mygatt* v. *N. Y. Protection Ins. Co.*, (21 *N. Y. Rep.* 52.)

4. It is perhaps, also, worthy of consideration whether the clause in the 1st section of the charter, authorizing the taking of "risks of inland navigation and transportation," is not such an assumption of a new business and of increased risks as, if the notes already given for fire insurance are attempted to be applied in payment of losses arising from such new risks, will not *annul* the liability of the makers thereof.

But I do not deem it necessary to go at large into a consideration of these questions, as I deem the Rensselaer Insurance Company illegally incorporated, and the attempt of the Rensselaer County Mutual Insurance Company to extend their charter under the act of 1849, a failure by reason of the lack of any such capital as was contemplated and required by the 5th, 11th and 14th sections of the act of 1849.

It remains to consider whether any of the defenses set up on the part of the defendants against a dissolution of the corporation are valid ; and

1st. As to the alleged official, legislative and judicial *recognition* of the validity of the incorporation and of the existence of this company. This is supposed to consist, (1,) in the approval of the charter by the attorney general and the certificate of the comptroller that it had premium notes to the full extent required by the 5th section of the act; (2,) in an amendment of the charter of the Rensselaer Insurance Company by the legislature in 1852; (3,) in the assumption of the guardianship and control of the affairs of the company by the appointment of a receiver, and otherwise, on the part of the court, acting for the sovereign power, and as a branch of the government.

(1.) The approval by the attorney general of the charter does not touch the question under discussion, and the certificate of the comptroller is a guarded and qualified one, and there is some doubt whether it comes up to the requirements of the 11th section of the act of 1849. But assuming that it does, I think it was no more than one of those *precautionary* steps sometimes taken for the purpose of preventing a

bold and palpable violation of law; that it only conferred an *apparent and prima facie* right to enter upon the business of insurance, and that it was not intended, nor has it the effect, to *commit* the state by an official and conclusive *admission*, on its part, that the defendants are absolutely entitled to the exercise of corporate privileges for thirty years, and was not designed as a bar to an action like the present for a dissolution of the company for non-compliance with the conditions precedent to its valid incorporation. (*See The People* v. *The Kingston and Middletown Turnpike Company*, 23 *Wend.* 210.)

(2.) In 1852 (*Laws of* 1852, *ch.* 313) the legislature authorized the Rensselaer Insurance Company, on certain conditions, to take marine risks, on complying with the first subdivision of the first section of the act of 1849. I do not regard this as a legislative recognition of the valid incorporation of the company under the act of 1849. The term Rensselaer Insurance Company was used mainly as matter of description; there was a pretended corporation doing business under that name; it applied for certain privileges, which were granted by the legislature. The latter did not inquire and were not called upon, I think, to inquire into the question whether it had complied with the prerequisites to its valid organization; nor did it know of its violations of law, if any such there were. It would be a dangerous rule to construe every amendment of a charter into a conclusive legislative recognition of the valid existence of a corporation. At all events, it appears to me it should not reach beyond a waiver of previous forfeitures arising from its violations of law; and not be regarded as a legislative license to pirate upon the community, if in fact found to be unsoundly or illegally organized. The case would of course be different if there had been a legislative examination into the questions here involved, and the legislature, with *full knowledge* (which is essential to a waiver of forfeitures) of its infraction of or non-compliance with the fundamental law of its existence, had

chosen, notwithstanding, to continue and enlarge its powers and recognize its right to exercise its corporate franchises.

(3.) I am not able to look upon the appointment of a receiver by this court, and the consequent partial assumption and control by the court of the affairs or funds of the company, as any such recognition of the due incorporation of the defendants' company, or estoppel upon proceedings for a violation of the law of its existence, as is claimed by the defendants to flow therefrom. The court acts in this matter, according to the theory of the law, as in all others of judicial cognizance, as the impartial judge between litigating parties, whether such parties be only citizens or citizens and the state. Nor has it otherwise control or guardianship of the funds of the company than as preserving them from waste or loss for the benefit of parties interested. Notwithstanding, it is in one sense a branch of the government; it is so not as identical with the people themselves, but as furnishing a convenient medium for the enforcement of their rights.

2d. Another defense now relied upon in argument is the statute of limitations.

(1.) I do not think the statute of limitations was intended to be pleaded. On application for permission to plead, it had been refused at special term, and I cannot believe that respectable counsel would persist in pleading the statute in violation of the order of the court. The language now claimed to amount to a defense of the statute is not introduced as a separate defense, nor apparently as a substantive and independent averment, but rather as incidental and collateral to a defense of the defendant Hyatt. The language is as follows: "That the defendant Hyatt is not and has not been acting as a corporation, but in the performance of his duties only as such receiver as aforesaid, in winding up the affairs of the corporation, *which ceased all business more than six years before this suit was commenced, and which commenced business under its extended charter more than ten years previous to the time aforesaid."* These averments, so far as they

relate to the lapse of six years since the company ceased business, are conceded not to have been intended to set up the statute, and they are not inappropriate—at least not palpably so—in aid of one of the points raised on the argument, to wit, that this action is brought under section 432 of the code, and to maintain it under that section the offending parties must be shown to be *now acting* (that it is at the time of the commencement of the suit) *as a corporation.* The allegation was probably made to raise that point.

(2.) But if the statute of limitations was intended to be pleaded and can be considered, notwithstanding the order of the special term, I am of opinion that it does not constitute an *effectual* defense, as the case is presented before me; for, (1.) It may be doubted whether the limitation is applicable to the people in a case of this nature. (2.) The phrase supposed to set up the statute does not show a defense. The cause of action sued on did accrue within ten years after the commencement of the action. The usurpation of corporate powers constitutes a *continued* cause of action, and the *last* of the acts relied on to establish such usurpation it is not pretended took place more than ten years since. (*Code,* §§ 97, 98.) (3.) Moreover, so far as I recollect the evidence, it does not expressly appear that the commencement of business under the extended charter which would be when probably the first act of usurpation occurred, was more than ten years before the commencement of the action. I cannot therefore give effect to this defense.

3d. The remaining defense relied on by the defendants is, that this action is brought under the third subdivision of section 432 of the code, and that it has not been proved that the defendants or any association or number of persons *were acting* (at the commencement of the suit) as a corporation without being duly incorporated. While it is true that the defendant Hyatt was appointed a receiver of the Rensselaer Insurance Company on account of the alleged insolvency of the company, in 1855, I am of opinion, nevertheless, that

The People *v*. Rensselear Insurance Company.

the defendants come within the purview of the section quoted. Hyatt is acting as the representative of the company, and exercising the powers and doing the business of the company. He is making the *assessments* for losses and doing other acts which but for their insolvency the company alone could perform. He, and the company through him, are exercising some at least of the very powers which they derive their sole authority to exercise (if they have any authority at all) from the act of 1849. Moreover, as there has been no dissolution of the corporation, nor any adjudicated forfeiture of their rights and privileges, I do not see why it is not possible that the receiver may be ultimately displaced and the company be permitted to resume active operations, except by some proceeding similar to that now instituted.

But I also think the action is well brought under section 430 of the code, and particularly under subdivision one of that section, which is as follows: " Whenever such corporation shall, 1, offend against any of the provisions of the act or acts *creating*, altering or renewing such corporation." If the company does not comply with the fundamental requisites of the act creating the corporation, I think it *offends* against its provisions, and is liable under that section to an action (and the present is substantially of that character) for the purpose of vacating the charter or annulling the existence of the corporation. (*People* v. *Kingston and Middletown Turnpike Co.*, 23 *Wend.* 204.) It may be, also, that it is liable under the 5th subdivision of the same section, for " exercising franchises or privileges not conferred upon it by law ;" although that subdivision appears more especially applicable to the case of a legally organized corporation usurping powers not conferred upon it by its charter or by-laws.

The result is, that this corporation must be adjudged to have no legal existence, and its existence must be annulled and its charter vacated, and it must cease to exercise the corporate powers, functions and privileges heretofore and now exercised and enjoyed by it or its receiver,

The People *v.* Rensselaer Insurance Company.

And I think this judgment may appropriately cover the action of the Rensselaer Insurance Company, whether under that name or charter and the act of 1849, or under the name and charter of the Rensselaer Mutual Insurance Company and the act of 1836. In the latter capacity, its legal existence has terminated by lapse of time; in the former capacity, by the fact of its never having been duly incorporated. The corporate body is essentially the same, though acting under a different name and to some extent with different powers. I cannot think it necessary to institute a new action to accomplish this result.

I think, also, the judgment should extend to the receiver, and prohibit his future action and institution of suits as receiver of either company, under his present appointment. On the dissolution of the corporation, or on proceedings for that purpose, he or some other person may be appointed receiver to wind up its affairs.

But while I think the receiver should be enjoined from instituting any new action, I am not disposed, at least at present and in this action, to interfere with suits already instituted and in progress. I think the parties in those suits should be heard before their rights are affected. They are to be permitted, therefore, to apply, in those suits respectively, for such stay of proceedings or other relief consequent upon the determination in this action, as they shall deem themselves entitled to.

I am inclined to think the case is one where the defendants as well as the plaintiffs are entitled to their costs out of the fund in the hands of the receiver; but I will reserve that and all further questions not determined above, to be adjusted on the settlement of the same.

[RENSSELAER SPECIAL TERM, October 6, 1862. *Hogeboom*, Justice.]