ATTORNEY GENERAL v. ERIE & KALAMAZOO RAILROAD CO.

*Railroad Companies—Charter obligations—Termini—Quo warranto.*

1. A chartered railroad company is bound to build its road between the termini named in its charter and then to operate the whole of it.

2. It is discretionary with the Supreme Court to grant an application for leave to file an information in the nature of quo warranto.

3. A railroad company chartered by the Legislature is a quasi-public corporation.

4. A chartered railroad company is responsible for the performance of the duties imposed by its charter, even though it has leased its road.

5. Leave to file an information in the nature of quo warranto was denied where the respondent was a railroad company, the forfeiture of whose charter would not redress the grievance complained of, which was that its lessee had discontinued part of its route and side-tracked a village which complained of the consequent loss of facilities for transportation.

Quo warranto. Submitted June 20. Decided Oct. 8.

Attorney General *Jacob J. Van Riper* and *Edward Bacon* for the writ.

*A. L. Millard* and *Ashley Pond* against.

CHAMPLIN, J. This is an application by the Attorney General for leave to file an information in the nature of a quo warranto against the Erie & Kalamazoo Railroad Company. Notice was given to the respondent, and it has been heard in opposition to the application. The Erie & Kalamazoo Railroad Company was chartered by an act of the territorial legislature of Michigan, approved April 22, 1833 (3 Terr. L. 1125). The charter was perpetual, but was amended in 1846 so as to authorize the Legislature at any time to alter, amend or repeal it.

As originally granted, the charter authorized the company to construct a railroad from Port Lawrence through or as near as practicable to the village of Adrian, and thence on the most eligible route to such point on the Kalamazoo river as they may deem most proper and useful. Important additional franchises were conferred upon the company by an amendment of its charter by an act approved March 26, 1835 (3 Terr. L. 1392). And by another amendment made in 1846, they were prohibited from constructing their road beyond the village of Adrian. The charter empowers the company to transport property and persons over their road by the force of steam or other power, and to charge and col-

lect tolls for the same. Under the grant of power conferred by this charter, the Erie & Kalamazoo Railroad Company located and constructed its road from Port Lawrence (now Toledo) to Adrian. As located and constructed, the road passed through the village of Palmyra, at which a regular passenger and freight depot was established. In 1849 the Erie & Kalamazoo Railroad Company leased its road and franchises to the Michigan Southern Railroad Company, in perpetuity.

The Palmyra & Jacksonburg Railroad Company was chartered by the territorial legislature when the township of Port Lawrence constituted a portion of Monroe county. After the loss of the "disputed ground" by the Act of Congress defining the northern boundary of the state of Ohio and admitting the State of Michigan into the Union, and the assent of Michigan thereto, the Legislature of this State passed an act by which the State agreed to release certain securities against the Palmyra & Jacksonburg Railroad Company, in consideration that it would release so much of its road as lay between the Michigan Southern road then owned by the State, and the Erie & Kalamazoo Railroad, and it was enacted that it should not be lawful for the Palmyra & Jacksonburg Company or its assignees ever to construct its road southerly beyond the Southern Railroad so as to connect with the Erie & Kalamazoo Railroad. Sess. L. 1846, p. 288. This legislation on the part of the State was in the interest of its own enterprise in building the Michigan Southern from Monroe to New Buffalo, by preventing the traffic which would pass over the Jacksonburg road from going to Toledo over the Erie & Kalamazoo road.

In 1846 the Michigan Southern Railroad Company was incorporated, and the State sold to this corporation the Michigan Southern Railroad, and it undertook the completion of the project which had been commenced by the State as part of her scheme of internal improvements. By the act of incorporation the Michigan Southern Railroad Company were bound to build the Tecumseh branch from the village of Tecumseh by way of the village of Clinton, and of Man-

chester to the village of Jackson, along the line formerly authorized to be constructed by the Jacksonburg & Palmyra Railroad Company. The road from Tecumseh to Manchester was completed in 1855, and from there to Jackson in 1857. In 1856 the Michigan Southern & Northern Indiana Railroad Company, which was the successor of the Michigan Southern Railroad Company, constructed a road from a junction with the track of the Erie & Kalamazoo Company about 5000 feet east from the station at Palmyra village to a connection with the road of the Michigan Southern Company at Lenawee Junction, so called; said Lenawee Junction being the point at which the Jackson branch road of the Michigan Southern Company connects with its main line of road between Adrian and Monroe. The main object of constructing this piece of road was to save the necessity of transporting passengers and freight coming from the direction of Toledo, destined over the Jackson branch or over the main line, towards Monroe, or coming from the Jackson branch or from Monroe, destined towards Toledo, around by the way of Adrian, thus saving a distance of about eight miles. Another object was to avoid the heavy grades and reverse curves which existed on the line of the Erie & Kalamazoo Company's road between Palmyra and Adrian.

There are several affidavits filed by the Attorney General in support of his application, from which it appears that the Erie & Kalamazoo Railroad Company, as early as 1835 or 1836, constructed its road between Adrian and the village of Palmyra substantially upon the line at present occupied by it, and that a general freight and passenger station was then established and has ever since until recently been maintained at Palmyra village; that this village contains about two hundred and twenty-five inhabitants, three stores, three blacksmith shops, one wagon shop, three halls, a graded schoolhouse, two churches, one steam saw-mill and one paper-mill; that it is the only village in a township containing about two thousand inhabitants; that soon after the completion of the road between Lenawee Junction and the Erie & Kalamazoo road east of Palmyra village, the company control-

ling and operating said Erie & Kalamazoo Railroad commenced gradually to withdraw the business which had been previously carried on over the Erie & Kalamazoo road between Palmyra and Adrian and to transfer it to the road to Lenawee Junction; but they still maintained depot facilities at Palmyra station and afforded the people all the usual accommodations at such station until 1867, when from that date to 1873 the railroad facilities at Palmyra station were still further diminished, and from 1873 the Lake Shore & Michigan Southern Railroad Company (who succeeded the Michigan Southern & Northern Indiana in 1869) has ceased and refused to deliver at said village freight in quantities less than car-loads; and since December 1, 1882 they have ceased to maintain any depot or station at Palmyra village, and have ceased to run freight and passenger trains over that portion of the Erie & Kalamazoo Railroad lying between the cut-off about a mile east of Palmyra village, and the point of junction of the Erie & Kalamazoo Railroad with the Michigan Southern Railroad near the city of Adrian, being a piece of road five and seventy one-hundredths miles in length; that instead of using said piece of road for the transportation of freight and passengers it is used as a place for the storage of cars, some of which are stock cars which are left in a filthy condition near to the residences of farmers, and constitute by reason of the stench arising therefrom a nuisance; that they have suffered this portion of the road to become out of repair and unfit for use in transporting passengers and freight; that a bridge has become so dilapidated that it is unsafe for engines or cars to pass over the same, and that none have passed over the same since December, 1882; that since that date no freight has been brought into the village except from the eastward and in car-loads; and that the company has continually refused to receive or deliver freight in quantities less than car-loads except as a special concession in favor of a paper-mill firm; that in 1877 they sold all the station buildings, water-tanks, sheds, platforms and appurtenances previously in use by the company in the village, and the same have been removed; that in

1881 they took up and removed· all the side track except about seven rods. These several acts are alleged to be a great public wrong and to have a blighting effect upon the village, transforming this modern Palmyra, like the ancient, into a Tadmor in the desert.

Affidavits have been filed and arguments made in opposition to this application, not denying that the station at Palmyra village has been practically discontinued, and the portion of the track above described wholly abandoned for the purpose of running and operating freight and passenger cars over the same, but excusing such non-user on economic grounds. Whether such a justification can be made to appear as will excuse the Erie & Kalamazoo Railroad Company from performing its charter obligations I do not think it proper to pass upon at this stage of the case. Upon general principles of law, the Erie & Kalamazoo Railroad Company were bound to construct their road between the termini named in their charter; and having so constructed it, to run and operate the whole and every material part thereof until relieved therefrom by the Legislature. Whether there are exceptions to this general principle, and whether the company may be able to bring itself within such exceptions, I shall not attempt here to decide. The question does not appear to me to be presented in such shape as to call for an expression of opinion upon it.

So far as the affidavits produced in support of the application set out the grievances of the residents of Palmyra in relation to being deprived of railroad facilities at Palmyra station, although of vital consequence to them, they do not appear to me to affect the general public. If to the greatest number of the patrons of the road increased facilities are afforded, time is saved and expense of transportation lessened, it would seem that the greater number interested would be benefited by the management as complained of. Admitting all that is alleged against the management, yet I fail to discover how a writ of quo warranto will afford redress to the citizens of Palmyra. If the charter should be declared forfeited, it will not restore the railroad or afford shipping

facilities in place of those now withdrawn. It may cause the right of way to revert to the owners and abate the nuisance complained of; but it will not give them a railroad station at Palmyra. It seems to me that those interested in having the Erie & Kalamazoo Railroad Company perform its duties to the citizens of Palmyra have mistaken their remedy. Their remedy lies, not in a forfeiture of the charter, but in compelling obedience to its requirements. I therefore lay out of view those portions of the affidavits showing personal or private grievances. The affidavits do show a violation of charter obligations in relation to the abandonment of a portion of the road. The Attorney General has thought such violation to be of sufficient importance to the public to call upon the company to show why its charter should not be forfeited, and he applies to us for leave to file an information in the nature of a quo warranto. It is obviously the intention of the statute that corporations shall fulfill the conditions and perform the duties enjoined upon them by their charters as the terms upon which they are permitted to enjoy their franchises.

No doubt the requirement that the Attorney General shall first obtain leave of the Court to file the information implies that the Court shall exercise a legal discretion in passing upon his request. Cases might, by possibility, arise where a technical breach of the charter condition would, in case of forfeiture, be followed by results disastrous to the best interests of the people. In this instance the railroad company complained of is a quasi public corporation. It subserves great public interests. It may safely be said that the State has outgrown that narrow policy which sought to compel all great lines of transportation from the west to the seaboard to pass through ports or points exclusively within her own borders. The people of this State are deeply interested and affected by every facility afforded to the great producing and manufacturing interests in finding ample facilities for transportation to the markets of the world. The Erie & Kalamazoo road forms the main line of the Lake Shore & Michigan Southern Railroad to Toledo and the east. Into this main

line a number of branch roads leading from the interior of the peninsula are connected.

The effect of a forfeiture of the Erie & Kalamazoo division upon a large section of the State would, for a time, be serious. Assuming, therefore, that here is a violation of the charter of the Erie & Kalamazoo Railroad Company, which, in the strict letter of the law, would call for a judgment of forfeiture, is it for the best interests of the people of the State, who are represented by the Attorney General, that such charter should be forfeited? Would we be exercising a sound legal discretion to permit the information, under the circumstances, to be filed? No one can be foolish enough to suppose that the link would not be restored by a new road, at whatever cost. What interest of public policy or even individual welfare, requires such unnecessary work and useless outlay of capital? Shall it be done simply as a penalty inflicted upon the Erie & Kalamazoo Railroad Company or its lessees? I agree with my brother Campbell that the penalty is too great in proportion to the offense alleged. Still, it must be remembered that the Court is possessed of no dispensing power. If the papers before us show to our satisfaction that the Erie & Kalamazoo Railroad Company has willfully violated its charter in matters relating to the essence of the corporate grant, thereby affecting the contract between the State and corporation, our duty is plain. No matter what the consequences may be in such case, the leave asked should be granted. It is therefore proper to consider, assuming that the fact that since 1882 the Erie & Kalamazoo Railroad Company have neglected to run cars for the transportation of freight and passengers over that portion of its road between Palmyra village and Adrian is a violation of its charter in a material point, whether such violation has been willful, since it must be not only an intentional but willful violation of its charter which will render the violator amenable to this process for the purpose of depriving it of its charter rights. In determining this question the entire history of the road, as well as of those with which it has been connected and by which it has been managed, is proper to be

considered.  Railroad facilities for the people of the township of Palmyra have not been lessened, except at Palmyra station, while others have been established in close proximity.  A glance at the map introduced by the respondent will show relatively the respective localities and distances.  A through line of railroad from Toledo to Adrian has been maintained and operated.  It is certainly questionable whether the discontinuance of a station upon a line of road at a place not named in its charter as a point through which it must pass, will constitute a ground of forfeiture of the charter, and I do not express any opinion upon it; and, aside from this act, the change of route by the lessees of respondent, and the management and operation of the railroad leased by them, do not indicate a design to willfully violate the charter of the Erie & Kalamazoo Railroad Company.  It is true, the people of Palmyra, by repeated petitions, besought both the Erie & Kalamazoo Railroad Company and its lessees to do them justice by continuing a general station at the village; but the question of the right to the station is not so clearly of the essence of the contract between the State and the company, and undisputed, as to fasten upon the company the design to willfully violate the contract in the discontinuance thereof.

I am not satisfied, from all the facts before us, that the failure of the Erie & Kalamazoo Railroad Company to run and operate its road the whole distance from Toledo to Adrian has been willful.  It evidently left its management and mode of operation entirely to its lessees; and while it has been engrafted into the system of railroads operated by its lessees, it has not become an integral part thereof, and its franchises and privileges are independent of such lessees and must be preserved by its own action; and it must be held responsible for the performance of those duties devolving upon it by the legislative grant; and now that its attention has been specially drawn to this obvious breach of duty by the Attorney General, should it persist in the course it has pursued for the past two years (unless relieved from the performance thereof by the Legislature), I shall feel it my duty

upon a future application, speaking for myself, to grant leave to file an information, in which case the whole range of inquiry will be opened to investigation on behalf of the State.

For the reasons stated I think the present application should be denied.

CAMPBELL, J.  The principal difficulty in this case seems to me to be concerning the discretion of the Court in giving judgment, if proceedings are once allowed.  Under the common-law practice as existing before our statute of 1846 was passed it was held by this Court that there was considerable discretionary power on this subject, inasmuch as the Attorney General was not required to apply for leave to file the information.  *People v. Oakland County Bank* 1 Doug. (Mich.) 282.  And in that case a nominal fine only was imposed, with an intimation that a repetition of the offense would lead to a judgment of forfeiture.  This same view seems to have prevailed in New York, when the doctrine on these matters was very thoroughly discussed in *People v. Kingston & Middletown Turnpike Co.* 23 Wend. 193; *People v. Bristol & Rensselaerville Turnpike Co.* 23 Wend. 222; *People v. Hillsdale & Chatham Turnpike Co.* 23 Wend. 254.

The records of this Court show that in 1845 an information was filed against respondent for violation of charter, to which objections were made for want of authority to proceed in that way.  The jurisdiction was sustained, but the Attorney General, in his annual report in January, 1846, called the attention of the Legislature to the importance of some statutory action on the subject, and at that session such provisions were included in the projected Revision, which came into effect in March, 1847, and is the statute under which this application is made.  But that same Legislature, by special statute which remitted the forfeiture of this charter, imposed some new conditions, among which were a specific tax, the rescission of the right to build north of Adrian, the repeal of section 19 which allowed other railroads to connect with it and the subjection of the charter to alteration, amendment

and repeal.   Sess. L. 1846, pp. 288–290.   The acceptance of this amendatory act appears in the Statutes of 1847, p. 218.

The statute now in force on the subject of quo warranto requires leave before such an information is filed, and makes the granting here, as in England, discretionary.  But it gives no range of discretion between fine and forfeiture.  Comp. L., § 7096; How. Stat. § 8657.  It is possible that this still leaves the Court power to fine as for a misdemeanor.  But the limit of such fines is now very small (Comp. L., § 7679), and would not be adequate for any serious offense.  At the same time it is quite evident that circumstances may make an entire forfeiture of charter a punishment which would be beyond the occasion, as affecting injuriously not only the corporation, but also the interests of other persons.  The Act of 1846 having given the Legislature such full power for the redress of wrongs under the charter, I think that the facts shown in answer to the motion are such as make it proper for us to deny the present motion, inasmuch as such denial will not bar a future prosecution, in case such should be the pleasure of the Legislature.  I am partly influenced in this view by the fact that a considerable part of this road is now beyond the limits of Michigan, so that no corporation hereafter created could, under any authority from this State, cover the same line.  The course of legislation concerning the part of the road now involved in this dispute indicates that this consideration has not been overlooked by the Legislature itself.

If I were satisfied that we had power on conviction to give any other judgment than forfeiture, I should feel bound to give my opinion in favor of allowing the information to be filed.  It is altogether likely that the action had by the persons in control has been under belief of its validity, and that question cannot be precluded by any preliminary action.  But the showing so far made is not quite satisfactory on that point, and the legislation in regard to the lines of road about Palmyra seems inconsistent with it.

The Erie & Kalamazoo Railroad Company has never had, as such, the right to build any road except between Port

Lawrence (now Toledo) and Adrian. That road was expressly required to be laid out and built within a limited time, and it was laid out and built so as to pass through the village of Palmyra and to the north-west of it. No change in this line has ever been sanctioned by the Legislature, and the road which now leaves this road and passes north-eastward so as to connect at the Southern Railroad with the line running north over the old line of the Palmyra & Jacksonburg Railroad, was not and could not have been built by respondent.

Reference has already been made to the repeal of section 19, which provided for connections with other roads. This repeal is in the direct line of a policy which was distinctly recognized, in opposition to furnishing outlets from Michigan by rail to ports in other states. How far this has been changed is a question not now important. That legislation is very significant as bearing on the present controversy.

When respondent was chartered Port Lawrence or Toledo was a Michigan port, in the possession of the territory, and under its full control. The State of Michigan insisted on its legal right to this territory for a considerable time after its organization. But after it became practically settled that Toledo was outside of our boundaries, the future legislation ceased to favor any further connections with this road as an outlet.

While this claim of territory was undecided a charter was granted to the Palmyra & Jacksonburg Railroad, which was to run from Palmyra to Jackson. The charter does not say whether the village or the township should be the terminus, but it evidently contemplated that the road should not stop at the town line, and subsequent legislation shows that the village was intended, as in 1840 the Legislature provided for lending that company enough rails to iron the track from Palmyra village to Clinton. Sess. L. 1840, p. 172. This road had previously been aided by the State by a loan of bonds. In 1841, when the interest was in arrears, the Auditor General was authorized to release the securities given by the company, but only on condition that it should release to the State so much of its road "as lies between the Southern Railroad

and the Erie & Kalamazoo Railroad." And it was in the same act expressly provided that thenceforward it should "not be lawful for said company or its assignees, ever to construct the said Palmyra & Jacksonburg Railroad southerly, beyond the Southern Railroad, so as to connect with the Erie & Kalamazoo Railroad." Sess. L. 1841, p. 140. The road north from the Southern Railroad it was required to complete to Clinton on the same gauge as the Southern road.

When the Southern road was sold in 1846 the State had become owner of this line north of the Southern Railroad, and included it in the sale. Not only did the State give the Southern road no right to make southern connections leading out of the State, but it absolutely prohibited it west of Monroe county. Sess. L. 1846, p. 176.

The Erie & Kalamazoo Railroad being the only southern outlet then permitted, and the junction between that and the Palmyra & Jacksonburg road having been forbidden, there is no doubt what this meant. It was designed to prevent any diversion from the Southern road and its Monroe terminus except so far as it was provided for by the Erie & Kalamazoo road as located between Toledo and Adrian.

It is therefore no legal excuse for the grievance now complained of, in discontinuing the use of the track through Palmyra to Adrian, that the track east of Palmyra and substantially in the direction of the Palmyra & Jacksonburg line, which was distinctly prohibited, furnishes for the general public an adequate outlet.

The Erie & Kalamazoo Railroad charter, whether the road is managed by its own directors or by lessees, can furnish no authority to any one to deviate from the charter conditions. The question of preference between the Palmyra interests and those of other persons is not one which we can settle. The Legislature, when it granted special charters and fixed the lines or termini, did so on grounds satisfactory to itself, which no court can review. A charter franchise must always be subject to the charter conditions, whether profitable or not. The privileges cannot be used and the burdens rejected. I think the respondent is legally bound to confine its business

to the line located under the charter, and not to discontinue it on any part of that line. Whether the company to which it has been leased can, in its separate capacity, lawfully divert business over the cut-off, is a question which respondent cannot present to us, and which we cannot on this record consider. But under the legislation already referred to it seems clear that respondent can make no arrangement for such a connection to the prejudice of its only line as recognized by law.

For these reasons I concur in denying the motion only on the ground that under all the circumstances and until action by the Legislature, I think a complete forfeiture would be a severer punishment than ought to be inflicted, unless respondent should fail to redress the grievance.

COOLEY, C. J.  I agree in the conclusions reached by my brother Champlin.  In the view I take of the facts there has been no forfeiture on the part of the defendant; but, as the result is agreed in, I do not deem it important to discuss facts.

SHERWOOD, J.  In this case I am unable to agree with my brethren in the conclusion they have reached.

I agree with Judge Champlin that "upon general principles of law the Erie & Kalamazoo Railroad Company were bound to construct their road between the termini named in their charter, and having so constructed it, to run and operate the whole and every material part thereof until released therefrom by the Legislature." And further, that railroad facilities are of vital consequence to the people of Palmyra and vicinity, as shown by the affidavits of the applicants. These people are a part of the general public, and there are more than a few individual interests involved.  They are a community with a village located on the line of this railroad, with interests requiring this road and a depot and freight facilities, and the regular daily running of cars over the road. The interests of this community, like those of all others along the line, were those intended to be secured and subserved by

the Legislature in granting the charter.   These interests, as the papers show, have not only been neglected, but more than abandoned by the company.   It has not only ceased to run its trains over the portion of the road complained of, but uses the track and right of way as storage ground for empty cars and all the nuisances usually accumulating in cars used for transporting stock, until the stench from the locality has become both offensive and a nuisance; and these things have not only been permitted but persisted in for a long time against the remonstrance of the community injured.   It has also abandoned its depot and station buildings, and suffered its track to go into dilapidation and decay to the extent of rendering it unfit for the ordinary uses of the road in transacting the carrying trade of the Palmyra community.   It seems to me very clear that such conduct and such management, whether by owners or lessees, must be held to be contrary to the privileges of the company, and in violation of its charter duties.

The complaints made, if they are well founded (and in considering the question upon this motion, whether they are or not, we should look most favorably upon the showing made by the applicants), indicate a disregard of the corporate duties of the company, whether willful or not, which would well warrant a forfeiture of their corporate franchise. Such acts and such neglects as are shown in the affidavits in support of this motion—admitted to be against the interests and convenience of the Palmyra community—cannot be excused by claiming them to be in the interest of the general public.   *General public* is not a very clear or well-defined term.   It may mean more or less, varying with the peculiar notions and views of the party using it.   While the managers of this road might consider it to mean those interested in the traffic of the entire line, including its leased lines, it is very evident such was not the general public whose interests were to be subserved when the Legislature granted the franchise, nor the general public whose interests were to be respected by the defendant, regardless of the several communities along the line of the Erie & Kalamazoo Railroad.   And if the

business of the existing corporation now using and managing this road requires greater accommodations, and other lines of road running in close proximity to this, the chartered obligations to continue the regular business of this road are thereby rendered no less imperative until the, company is properly relieved therefrom. Neither do I think that the fact that the discontinuance of the advantages of railroad facilities to this Palmyra community would be of increased advantage to the greater number of patrons of the road, is any excuse for so doing. All of its patrons are entitled to equal privileges along the line of its road, and they cannot be legally deprived of them by the defendant.

Of course, a reasonable discretion may be used by the company in extending or furnishing to any community facilities for the transportation of passengers and freight, and in determining the points at which stations shall be established along the line of the road for receiving the same; but that discretion cannot be used to the extent of denying the facilities wholly to any community, and that seems to have been done in this case. Palmyra was a point at the time the charter was granted of sufficient importance to require these privileges, and there is no showing that it has grown less so, however it may be regarded by the defendant.

I quite agree with my brother Champlin that this railroad is a quasi public corporation and subserves great public interests. But it was intended to subserve the interests of private individuals and communities as well, and under its charter cannot disregard the one any more than the other; and while a technical violation of its charter in either case, if not willful, will not be considered by this Court, it would be an act of injustice to the citizen, not tolerable in courts, to discriminate in favor of the former, and it should not be done.

My brother Campbell in his opinion in this case shows conclusively that when the Southern Railroad was sold in 1846 the State had become owner of the line of railroad known as the Palmyra & Jacksonburg Railroad, which was north of the Southern Railroad, and included it in the sale. Not only

did the State give the Southern road no right to make connections leading out of the State, but prohibited it west of Monroe county. And I quite agree with him in his conclusions that "the Erie & Kalamazoo Railroad, being the only southern outlet then permitted, and the junction between that and the Palmyra & Jacksonburg road having been forbidden, there is no doubt what this meant. It was designed to prevent any diversion from the Southern road and its Monroe terminus, except so far as it was provided for by the Erie & Kalamazoo road, as between Toledo and Adrian;" that "it is therefore no legal excuse for the grievance now complained of in discontinuing the use of the track through Palmyra to Adrian, that the track east of Palmyra and substantially in the direction of the Palmyra & Jacksonburg line, which was distinctly prohibited, furnishes for the general public an adequate outlet;" that "the Erie & Kalamazoo Railroad charter, whether the road is managed by its own directors or by lessees, can furnish no authority to any one to deviate from the charter conditions. The question of preference between the Palmyra interests and those of other persons is not one which we can settle. The Legislature, when it granted special charters and fixed the line of termini, did so on grounds satisfactory to itself, which no court can review;" that "a charter franchise must always be subject to the charter conditions, whether profitable or not. The privileges cannot be used and the burdens rejected. I think the respondent is legally bound to confine its business to the line located under the charter, and not to discontinue it on any part of that line. Whether the company to which it has been leased can, in its separate capacity, lawfully divert business over the cut-off is a question which respondent cannot present to us, and which we cannot on this record consider;" and that under the legislation as it now stands the "respondent can make no arrangement for such a connection to the prejudice of its only line, as recognized by law."

This is an application for leave to file an information in the nature of a writ of quo warranto, and I do not think it proper now to discuss the consequences of a forfeiture to the

defendant. While they may be considered upon the return of the writ in the final adjudication, I do not think even then they should control, when the facts show a clear case of forfeiture; neither do I think a forfeiture should be regarded as in the nature of a punishment or penalty. The franchises granted are in the nature of a contract with the company, by the terms of which the company agrees to furnish to individuals and the public the transportation facilities (for a reasonable consideration) mentioned in the charter, and on failing to do so, surrender up the franchise; and the judgment of the Court in the matter can do no more than determine the fact of failure, and declare the forfeiture; at least, it is doubtful whether it can do more under the law as it now stands.

I do not mean to say that damages or a penalty may not be awarded under the law for gross neglects or willful conduct in the performance of its duty or use of its franchises on the part of the company, not amounting to a forfeiture. It is unnecessary to discuss that question now, as in my judgment a different case is presented by the Attorney General; neither do I agree in the suggestion that the remedy of the Palmyra community " does not lie in proceedings for forfeiture of the charter, but in compelling obedience to its requirements." It is true, obedience to the requirements of the charter is the object most desired; but if this cannot be compelled, then a surrender of the franchise becomes necessary that it may be conferred upon another. And it is quite possible, where the right to forfeiture is contested as in this case, the negligent company may be induced to resume the proper discharge of its duties rather than subject itself to the consequences of forfeiture. Certainly, if there is any other remedy by which the company can be compelled to observe the requirements of its charter, I have not heard it suggested. I think the leave asked by the Attorney General should be granted.